372 A.2d 895

**David Michael FREED, a minor, by Agnes J. Freed, his guardian, Appellant,**

v.

**Robert M. PRIORE.**

Superior Court of Pennsylvania.

Argued November 12, 1976.

Decided April 19, 1977.

420

John E. Evans, Jr., Evans, Ivory & Evans, Pittsburgh, for appellant.

Bruce R. Martin, Pittsburgh, for appellee.

Before JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

HOFFMAN, Judge:

Appellant contends that the lower court erred in denying his motion for a new trial which he based on after-discovered evidence and improper expert testimony. We affirm the order of the lower court.

Appellant, David Freed, a minor, through his mother, Agnes Freed, brought this action in trespass to recover damages for negligently inflicted injuries. Appellant suffered injuries during his delivery, at birth, by the appellee-obstetrician, Robert Priore, on May 25, 1971, in Pittsburgh, Allegheny County.

Appellant's theory for recovery, presented through his expert, Dr. Paxson, is based upon Dr. Priore's failure to realize that the baby was in a breech position[1] until one

1. In a breech delivery, the baby's buttocks are delivered first, the head last; whereas in a normal vertex delivery the head is first. The risk of injury to a child in a breech delivery is significantly greater than in a normal vertex delivery. Because the buttocks are smaller than the head, they do not provide a sufficient driving wedge to fully dilate the cervix and allow the head to pass through the cervix.

hour prior to his delivery. Appellant asserts that Dr. Priore's administration of the drug spartocin[2] to Mrs. Freed and use of a spinal anesthesia created an emergency situation in the delivery room. Appellant also contends that Dr. Priore erred by performing a total breech extraction rather than a partial breech extraction[3] and in improperly applying forceps to the child.

Appellee and his expert witness, Dr. Hayashi, presented a completely different statement of facts, and a different medical analysis. Appellee stated that it is very common to be unable to ascertain whether a child is in a vertex or breech presentation until after the amniotic sac bursts.[4] In the instant case the doctor made a breech diagnosis after the sac burst. Appellee stated that spartocin and spinal anesthesia are used without complication in partial breech extractions. Appellee and his expert testified that the Freed delivery was a partial breech extraction not a total extraction and that the use of forceps was required in order to deliver the child immediately. Appellee's expert also testified that the Freed baby was an intrauterine growth retarded (hereinafter IUGR) baby,[5] which complicated the delivery further.

**2.** Appellant contends that spartocin speeds up uterine contractions which is undesirable in a breech delivery; appellee contends that spartocin does not speed up uterine contractions, but makes them more efficient.

**3.** In a total breech extraction no part of the baby's body has emerged through the cervix and the doctor must manually pull the child through the cervix. In a partial breech extraction the baby's body will have partially emerged through the cervix, the doctor will only have to assist in the extraction of a part of the body, usually the head and arms.

**4.** The child, while in the uterus lives in a sac of fluid known as the amniotic sac. This sac bursts just prior to birth.

**5.** An IUGR baby is one which has been carried in the uterus the full gestational period or longer, yet which has a relatively low birth weight. Characteristically, an IUGR baby has wasted, flacid buttocks but a normal sized head. Studies indicate that they have a fairly high mortality rate and, in those that survive, there is an increased risk of neurological abnormalities.

The jury resolved the conflict in testimony in favor of appellee, Dr. Priore. On May 28, 1975, appellant filed timely motions for a new trial. On October 14, 1975, appellant filed supplemental reasons for a new trial and attached a copy of an article published in a medical journal in support of his motion. The court, en banc, denied the motion for a new trial. This appeal followed.

Appellant first contends that he was deprived of a fair trial because appellee's expert testified falsely. During the trial, appellant did not realize that Dr. Hayashi's testimony was inaccurate. After the trial, appellant found the article upon which Dr. Hayashi based his questioned testimony. As a result of this after-discovered evidence, appellant moved for a new trial. The alleged false testimony of Dr. Hayashi occurred on redirect examination:

"Q. Now, Mr. Evans [appellant's counsel] put some figures on the board there for the length and head size; right?

"A. Yes.

"Q. Do those figures include the figures that are on the paper? Do they include the figure that was critical in determining that this was an intrauterine growth retarded baby?

"A. No. The most critical measurement is left out of there. The most important measurement is the weight, 2500 grams.

Now, to us, in the last couple years, we are more and more concerned with the baby who is at term and who is small in many respects. When the baby is less than 2500 grams, beyond 37 weeks, by Dr. Yerushalmy's classification, there is almost a 95 per cent perinatal loss.[6] If it's above 2500 grams, its got about a seven per cent perinatal loss. In other words, this baby is in a group where you have a high death rate. It is not a healthy, normal situation, when you have an intrauterine growth retarda-

6. Perinatal refers to the time when a baby is in the uterus and immediately after it is born. Dr. Hayashi was stating that, of the IUGR babies which weigh less than 2500 grams and have a gestation period of more than 37 weeks, there is a 95% mortality rate.

tion at 37 weeks plus. In this case, it was 40 weeks, and the baby is 2500 grams or less. It is in a dangerous position, a high—in fact, the New York Mortality Report was 59 per cent of the babies in this group died that were less than 2500 grams. This is not a health situation. I'm pointing out, intrauterine growth retardation, as we are studying more and more of this problem, is a serious problem for the obstetrician."

Appellee apparently concedes that the 95% and 59% mortality figures used by Dr. Hayashi are not accurate. The article to which Dr. Hayashi referred was written by Dr. J. Yerushalmy on the subject of intrauterine growth retarded babies and was published in March, 1970, by Clinical Obstetrics and Gynecology, a medical journal. Appellant asserts that at trial he had no knowledge nor means of knowing of the statistics presented by Dr. Hayashi. He alleges that four months after the trial he discovered the article upon which this false testimony was based.

Initially, we note that a motion for a new trial based on after-discovered evidence is committed to the sound discretion of the court below and we will not reverse unless there is a clear abuse of discretion. *Higbee v. Koziol*, 383 Pa. 116, 117 A.2d 707 (1955); *Meholiff v. River Transit Co.*, 342 Pa. 394, 20 A.2d 762 (1941); *Suravitz v. Prudential Ins. Co.*, 261 Pa. 390, 104 A. 754 (1918).

To secure a new trial on the ground of discovery that false testimony was given at trial, the complaining party must be able to meet the general test applied to applications for a new trial on the ground of after-discovered evidence. *Limper v. Phila. Electric Co.*, 297 Pa. 204, 146 A. 574 (1929); *Suravitz v. Prudential Ins. Co.*, supra. "The law is clear that in order to justify the grant of a new trial on the basis of after-discovered evidence, the evidence must have been discovered after the trial and must be such that it could not have been obtained at the trial by reasonable diligence, must not be cumulative or merely impeach credibility and must be such as would likely compel a different result." *Townsend Will*, 436 Pa. 185, 190, 258 A.2d 518, 520 (1969); *Limper v.*

*Phila. Electric Co.*, supra; *Hydro-Flex, Inc. v. Alter B. Co. Inc.*, 223 Pa.Super. 228, 296 A.2d 874 (1972).

In appellee's pre-trial report, filed February 28, 1975, Dr. Hayashi indicated several problems attendant to the delivery of an IUGR baby in a breech position. Thus, appellant was aware two and one-half months prior to trial that intrauterine growth retardation would be an issue raised by appellee's expert. The article by Dr. Yerushalmy, which analyzed the New York Mortality Reports, had been published five years prior to the time of the instant trial. It is obvious that if appellant had used due diligence he could have discovered the article in question prior to, or at the time of trial.

Moreover, appellant's after-discovered evidence does not meet the other standards for granting a new trial. It is clear that the mortality rates from the article in question would only be used to impeach appellee's expert and cast doubt upon his credibility because the testimony does not concern any material fact relating to appellee's conduct during delivery. Finally, the article is not such evidence as would be likely to result in a different verdict. The inaccurate statements of Dr. Hayashi were not relevant to the negligence of Dr. Priore, nor were these mortality figures relevant to the Freed baby's situation because he survived delivery and the neonatal period. Therefore, new testimony on IUGR mortality rates would not result in a different verdict. We conclude that the trial court did not abuse its discretion in refusing to grant a new trial based upon after-discovered evidence.

 Appellant also contends that the lower court erred in permitting appellee's expert to testify, over objection, on an ultimate issue of fact. The questioned testimony occurred on redirect examination of Dr. Hayashi:

"Q. Doctor, in your examination of this case, have you found anything which had any adverse effect on this mother or child, which the standards of the profession required Dr. Priore to do, which he did not do, or which he failed to do that he should have done?

"MR. EVANS: I object to that as going way beyond the qualifications of the Doctor.

"THE COURT: The objection is overruled.

"A. I have carefully looked at the records. I consider that Dr. Priore administered quality obstetrical care to Mrs. Freed during her pregnancy and labor. Unfortunately, modern obstetrics being what it is, hasn't solved all the questions. This is one of the unresolved problems in modern obstetrics. I don't see any part in his treatment of Mrs. Freed where I could call it mistreatment or bad management. He administered quality obstetrical care.

"MR. MARTIN: That's all I have."

In a medical malpractice case in Pennsylvania it is necessary that expert medical testimony be introduced to establish that a defendant has negligently carried out his professional duties and departed from the standard of care exercised by other physicians. *Chandler v. Cook*, 438 Pa. 447, 265 A.2d 794 (1970); *Lambert v. Soltis*, 422 Pa. 304, 221 A.2d 173 (1966); *Ragan v. Steen*, 229 Pa.Super. 515, 331 A.2d 724 (1974).[7] Further, when an expert witness states his opinion, this testimony is to be received by the jury just as any other opinion testimony. The court and jury are not bound by an opinion of an expert. Expert testimony, if believed, merely proves, that, in light of the expert's general experience and his observations of plaintiff, he had reached the conclusions announced. These opinions are to be considered with the other evidence; they may be rejected in whole or in part; the weight to be given them is for the jury. *Cooper v. Metropolitan Life Ins. Co.*, 323 Pa. 295, 186 A. 125 (1936); *Baur v. Mesta Machine Co.*, 195 Pa.Super. 22, 168 A.2d 591 (1961).

In the instant case, Dr. Hayashi testified extensively on direct and cross-examination. His testimony involved a multitude of extremely complex medical explanations for

7. "The only exception to the requirement that expert testimony be produced is 'where the matter under investigation is so simple, and the lack of skill or want of care so obvious, as to be within the range of ordinary experience and comprehension of even nonprofessional persons.'" *Smith v. Yohe*, 412 Pa. 94, 99, 194 A.2d 167, 170 (1963).

Dr. Priore's actions. The opinion that he gave on redirect examination was merely a summary of his prior testimony which stated his overall opinion of Dr. Priore's conduct. Both appellant and appellee presented comprehensive expert testimony over a period of several days; it is hard to conceive that one sentence made by one expert would have such an overwhelming influence on the jury as to cause them to abandon their own judgment for that of Dr. Hayashi.[8] Further, the court gave a comprehensive charge to the jury on opinion testimony and appellant did not object to the court's instruction. This expert opinion could be received by the jury along with the remainder of the expert testimony to be evaluated and weighed by them and accepted or rejected. We find no abuse of discretion by the lower court in admitting the opinion of Dr. Hayashi.

Order affirmed.

JACOBS and VAN der VOORT, JJ., concur in the result.

SPAETH, J., files a dissenting opinion.

WATKINS, President Judge, absent.

SPAETH, Judge, dissenting:

I find no basis in the record for the majority's statement that "[i]t is obvious that if appellant had used due diligence he could have discovered the article in question prior to, or at the time of trial." Majority opinion 247 Pa.Super. at 425, 372 A.2d at 899. The article was five years old; it had not been mentioned in Dr. Hayashi's pretrial report (R. 220a–221a), or otherwise pretrial. Nor can I accept the majority's statement that "[i]t is clear that . . . the article . . .

8. Since 1942, there has been a trend to abandon the rule that witnesses would not be permitted to give their opinions or conclusions upon an ultimate issue of fact. See McCormick on Evidence, "This change in judicial opinion has resulted from the fact that the rule excluding opinion on ultimate facts in issue is unduly restrictive, pregnant with close questions of application and the possibility of misapplication, and often unfairly obstructive to the presentation of a party's case, to say nothing concerning the illogic of the idea that these opinions usurp the jury function." McCormick on Evidence, pp. 27–28.

would only be used to impeach appellee's expert . . . .
[T]he article is not such evidence as would be likely to result
in a different verdict." *Id.* As the majority acknowledges,
majority opinion 247 Pa.Super. at 423, n. 6, 372 A.2d at 898,
n. 6, Dr. Hayashi testified that according to the article ("by
Dr. Yerushalmy's classification") the baby had only a 5%
chance of living. To me it seems quite possible that the jury
accepted this, and decided that since despite such odds the
baby had lived, appellee must not have been negligent.

Appellant has reproduced what appears to be the article,
at pages 224a–246a of the record. From this it appears that
in fact "by Dr. Yerushalmy's classification" the baby had a
very high chance of living (about 26 deaths per thousand, or
a 2.6% death rate), which would mean that the testimony at
trial was a gross misstatement.

In refusing to grant a new trial because of this misstate-
ment the lower court said:

First, we are on an excursion outside the record in deter-
mining the content of the article . . . . Additionally,
there is the question whether the article . . . is in
fact the correct article. Thirdly, the subject matter . .
necessarily requires the assistance of expert testimony to
establish its meaning and significance. Finally, there is
the question . . . whether they [the doctor's state-
ments] played any part in procuring the verdict . . . .
Record at 4a.

With respect to the last of these reasons: As I have
already stated, to me it seems quite possible that the jury
was affected by the doctor's statements. With respect to
the other three reasons: These reasons would support the
conclusion that a new trial should not be awarded *now*. The
lower court, however, used them to support the conclusion
that a new trial should not be awarded *ever*, and with that
conclusion I disagree. There is at least a possibility that the
verdict was the result of demonstrably untrue testimony.
Given that possibility, in my opinion the lower court should
have conducted a post-trial hearing to determine whether in
fact there is any question about the identity and content of

the article, and (availing itself of expert testimony) whether the article was as grossly misstated as appellant asserts. Then the lower court would be able to engage in a sound exercise of its discretion in deciding whether to grant a new trial.

Granted that any trial is to some extent an imperfect event, still, a distinction is to be drawn between imperfections attributable to lack of skill or preparation, and imperfections attributable to disregard for the truth. When considering the former, it may be reasonable for a court to deny a new trial; life must go on, and other cases are waiting. When considering the latter, however, a court should be quick to act; the purity of its own process is at issue.

I would remand for further proceedings.