454 A.2d 46

**Andrew MATTOX**

v.

**CITY OF PHILADELPHIA and Eastern Body Company and City Tank Corporation.**

**Appeal of CITY OF PHILADELPHIA.**

Superior Court of Pennsylvania.

Argued Feb. 23, 1982.

Filed Dec. 10, 1982.

Petition for Allowance of Appeal Denied March 30, 1983.

112 

114

Alan J. Davis, City Sol., Philadelphia, for appellant.
Lawrence D. Finney, Philadelphia, for appellees.

Before SPAETH, BROSKY and BECK, JJ.

BECK, Judge:

The City of Philadelphia (hereinafter "City") appeals an order of the Court of Common Pleas of Philadelphia County which denied the City's motions for a judgment n.o.v. or a new trial and which entered judgment in favor of Andrew Mattox (hereinafter "Appellee") in the amount of two hundred and twenty thousand dollars ($220,000) plus interest as provided in Pa.R.C.P. 238. We affirm.

■ Our scope of review in such cases is clearly settled. In reviewing a motion for a judgment n.o.v., we must consider the evidence most favorable to the verdict winner and all reasonable inferences therefrom. *Ditz v. Marshall,* 259 Pa.Super.Ct. 31, 35, 393 A.2d 701, 703 (1978). "A judgment n.o.v. should be entered only in a clear case, and any doubts should be resolved in favor of the verdict." *Atkins v. Urban Redevelopment Authority of Pittsburgh,* 489 Pa. 344, 351, 414 A.2d 100, 103 (1980).

■ In reviewing a motion for a new trial, we must consider all the evidence adduced at the trial to ascertain whether the verdict was manifestly against the weight of the evidence. *Ditz,* 259 Pa.Superior Ct. at 35, 393 A.2d at 703. "[T]he decision to either grant or deny a motion for new trial is within the sound discretion of the trial court and will be reversed on appeal only if the appellate court determines the trial court palpably abused its discretion," *Myers v. Gold,* 277 Pa.Super.Ct. 66, 69, 419 A.2d 663, 664 (1980), or committed "a clear error of law." *Eldridge v. Melcher,* 226 Pa.Super.Ct. 381, 387, 313 A.2d 750, 754 (1973), *allocatur denied.*

On December 3, 1973, Appellee, then an inmate at the House of Correction, was injured while working on the prison garbage collection detail. The facts surrounding Appellee's injury were well and succinctly summarized by the trial court[1] as follows:

**1.** We note the comprehensive and ably crafted opinion of the Honorable John J. McDevitt III of the Court of Common Pleas of Philadelphia County.

[Appellee] was assigned to the garbage detail, requiring him to ride on a trash truck around the prison and at the city-owned Riverview Home. The standard procedure for loading trash was ...: the driver, a correction officer, would stop the truck at a designated pick-up where inmates would dump garbage into the back of the truck. Some one [*sic*] would call to the correction officer, who would be in the cab of the truck (N.T. 62), to engage the power take-off (P.T.O.) (N.T. 356). This procedure could only be done when the truck was in neutral. (N.T. 319) After the trash was dumped, one of the inmates would operate a lever at the passenger's side of the truck, towards the rear, which would actually activate the [trash compacting] blade. (N.T. 61–62) Only when the P.T.O. was engaged could the blade be operated. A buzzer system was located at the rear of the truck for the purpose of signaling the driver when to engage the P.T.O. and when to turn it off. However, this buzzer was not operable on the day of the accident. (N.T. 63) Consequently, when the crew was finished at a stop, one of the inmates would have to yell to the driver to signal that they were ready to go. (N.T. 120) Upon receiving such notice, the driver would then disengage the P.T.O. and drive on.

The rear of the truck, where the mishap occurred, had three prominent features. First was the loading or hopper sill, about two to four inches wide, against which the blade came in contact when the compactor was in operation. Second, about three inches below the loading sill, was a four inch ledge or "lip," formed by a piece of structural steel known as the "T." This piece, when placed on its side, had been welded onto the truck after the vehicle was purchased by the City. Finally, there was a bottom step below the license plate, approximately nine inches below the 'T' bar ledge ....

On the date in question, the accident occurred at approximately 9:30 a.m. at the truck detail's last stop, the Riverview paint shop (N.T. 64). [Appellee] had emptied

the last of the trash into the hopper and had operated the compactor blade to pack this garbage into the truck (N.T. 64). [Appellee] then resumed his position on the back of the truck, standing on the hopper sill, in anticipation of returning to the House of Correction. Instead, the compactor blade was activated again, catching the tip of [Appellee's] left foot between the blade and the hopper sill. As a result, all of the toes on that foot were severed
. . . .

On appeal the City's first argument is that Appellee should be denied recovery because his injury was in part occasioned by his own contributory negligence.[2]

" 'It is well settled that where a person has a choice of two ways, one of which is perfectly safe and the other subject to obvious risks, and voluntarily chooses the latter and is injured, he is guilty of contributory negligence." *Strother v. Binkele,* 256 Pa.Super.Ct. 404, 415–16, 389 A.2d 1186, 1192 (1978) (citations omitted); *Claytor v. Durham,* 273 Pa.Super.Ct. 571, 417 A.2d 1196 (1980).

As was stated in *Gregorius v. Safeway Steel Scaffolds Co.,* 409 Pa. 578, 584, 187 A.2d 646, 649 (1963), working conditions must be considered together with other evidence in determining the question of contributory negligence ...: "In determining the standard of conduct of one who is injured in the performance of his employment, the working conditions and all of the circumstances incident thereto, including his obligation to do his job, must be considered . . . ."

*Lambert v. PBI Industries,* 244 Pa.Super.Ct. 118, 131, 366 A.2d 944, 950–51 (1976), *allocatur denied.*

At trial Appellee testified that the three inmates assigned to the garbage detail[3] would customarily ride from one

**2.** "Comparative negligence principles are not to be applied in any case where the cause of action arose before September 7, 1976, regardless of when the case is tried." *Fahringer v. Rinehimer,* 283 Pa.Super.Ct. 93, 101, 423 A.2d 731, 735 (1980). *See* 42 Pa.C.S.A. § 7102.

**3.** Appellee testified that each inmate at the House of Correction had to perform some type of work or face solitary confinement.

garbage collection site to another on the loading sill at the rear of the trash truck, the precise location in which Appellee received his injury. Appellee stated that the inmates could not stand on the "T" bar ledge at the rear of the truck because the ledge was too narrow to permit secure footing. In addition, Appellee contended that the inmates could not stand on the bottom step below the "T" bar ledge because the "T" bar ledge extended beyond the rear of the truck body and caused anyone standing on the bottom step to assume an awkward jackknife position in order to prevent the protruding ledge from bruising his shins.

In support of this latter contention Appellee offered the expert testimony of Dr. James Currie, associate professor of mechanical engineering at Villanova University, who had examined scale drawings [4] of the trash truck as it originally appeared when purchased by the City and as it appeared when in use at the time of Appellee's injury after the truck had been structurally altered by the City.

Dr. Currie explained that the City had made two significant modifications of the truck's original rear design: (1) the addition of a "T" bar ledge and (2) a change in the bottom step. In discussing the effects of these modifications Dr. Currie stated:

> In my opinion, this whole thing is a . . . defective design
> . . . .
>
> . . . .
>
> If, for example, this [bottom step] were to be a step, as any step on a ladder would be, it's inclined the wrong way.
>
> You've got to step with your feet up underneath and you've got a . . . horizontal bar ["T" bar ledge], sticking back into your knees.
>
> Steps are not built that way. Steps are built inclined the other way.

4. In addition to scale drawings of the original and modified trash truck, pictures of the modified truck together with a scale model built from pictures and blueprints of the truck, were introduced into evidence.

. . . .

Here we have an inverted step [bottom step], ... inverted ladder. It would be almost like ... trying to climb up to your roof with the ladder leaning back.

Dr. Currie further asserted that the drawings revealed that the original bottom step at the back of the truck had a slip-resistant surface whereas the modified bottom step lacked a non-skid surface.

Appellee also maintained that the truck cab would only accommodate two passengers [5] in addition to the correction officer who drove the truck and that the inmates were only permitted inside the cab during inclement weather.[6] In contrast, as the City's witness, the correction officer who had been driving the trash truck at the time of Appellee's injury, testified that he had told the inmates always to ride inside the truck cab or walk between collection sites.

■ Assuming arguendo the credibility of Appellee's evidence, the City argues that even if Appellee was not negligent in standing on the hopper sill while the truck was traveling from one collection site to another, Appellee was nevertheless negligent in positioning himself on the hopper sill at the time of his accident because the officer driving the trash truck had not been signaled to disengage the P.T.O. by taking the truck out of neutral, the only gear in which the P.T.O. was operable.[7] Responding to the City's

---

**5.** Appellee stated that when it was raining or snowing, two of the inmates—on a first come, first served basis—could join the correction officer in the truck cab. The third inmate would hang on the door of the cab.

**6.** There was no testimony that on the date of Appellee's accident the weather had been inclement or that any of the inmates had been permitted to ride inside the cab.

**7.** In connection with this argument the City states in its brief that when Appellee stepped onto the hopper sill, he realized that another inmate was standing on the passenger's side of the truck at the lever which activated the trash compacting blade and was not in a position to see Appellee on the hopper sill. However, in *Gregorious v. Safeway Steel Scaffolds Co.,* 409 Pa. 578, 583–84, 187 A.2d 646, 648 (1963), the Supreme Court of Pennsylvania declared that "[o]ne does not have to anticipate that another will negligently cause him injury, in other

argument, Appellee asserts that since all the garbage had already been collected and compacted at the particular collection site and since the truck had completed its last collection of the day, he reasonably relied on the fact that the P.T.O. would be disengaged so that the truck could return to the House of Correction. The City, however, questions the reasonableness of Appellee's act by noting that Appellee was the only inmate who attempted to stand on the sill at that exact moment.

The City's motion for a judgment n.o.v. was properly denied because "[c]ontributory negligence can be determined as a matter of law only where it 'is so clearly revealed that there is no room for reasonable disagreement as to its existence.'" *Claytor*, 273 Pa.Superior Ct. at 577, 417 A.2d at 1199 (citation omitted).

> Judgment n.o.v. is inappropriate if the evidence on a material point presented an issue of fact for decision by the jury. This method of attacking the verdict may never be utilized so as to invade the province of the jury, especially where that determination is based partly on questions of conflicting testimony and credibility of witnesses .... Where such questions were determined by the trier of fact, and if there is reasonable support for the verdict which was rendered, a judgment n.o.v. will not be granted, as the weight of the evidence is a jury matter and may only be raised by a motion for a new trial if the verdict is contrary to the weight of the evidence. As to whether there is reasonable support in the evidence for the verdict, it should be noted that the evidence may be found sufficient, though it be meager or uncorroborated.
>
> ....
>
> .... [I]t is not this Court's function to substitute our judgment or evaluation of evidence where there is some credible evidence upon which to base the jury's verdict .... "[T]he evidence presented must be such that by

words, he is not bound to guard against lack of ordinary care on the part of another ...." Thus, the lack of care of a co-worker should not be imputed to Appellee.

reasoning from it, ... a jury can reach the conclusion sought by plaintiff, and not that that conclusion must be the *only* one which logically can be reached ...."

*Eldridge,* 226 Pa.Superior Ct. at 386–87, 313 A.2d at 753–54 (emphasis in original); *Canery v. Southeastern Pennsylvania Transportation Authority,* 267 Pa.Super.Ct. 382, 406 A.2d 1093 (1979); *allocatur denied,* October 31, 1979. Here, conflicting evidence was presented on several, material issues; hence, it would have been improper for the trial court to have removed such matters from the jury's consideration. Moreover, the jury's verdict was supported by ample evidence in the record. Consequently, we hold that the trial court correctly denied the City's motion for a judgment n.o.v.

Additionally, the City's motion for a new trial was properly denied because

a new trial should be granted only where the verdict is so contrary to the evidence as to shock one's sense of justice .... A new trial should not be granted where the evidence is conflicting and the jury might have found for either party, nor where the trial judge would have reached a different conclusion on the same facts.

*Myers,* 277 Pa.Superior Ct. at 69, 419 A.2d at 664.

In this case, Appellee's expert witness, Dr. Currie, testified that the City had improperly redesigned the bottom step at the rear of the trash truck and that the City's addition of a "T" bar had rendered the bottom step virtually inaccessible, making the hopper sill the only available area on which the inmates could stand. Both Appellee and the City presented contradictory evidence of the work standards employed by the prison garbage detail. Appellee and the City also offered varying accounts of the reason for Appellee's presence on the hopper sill at the time of the accident. Confronted with these facts, we cannot say that the jury's verdict is opposed to the evidence and requires a new trial. Thus, we hold that the trial court did not abuse its discretion in refusing to grant the City's motion for a new trial.

Next, the City contends that Appellee's expert witness, Dr. Currie, usurped the jury's function by impermissibly proffering his opinion on an ultimate issue in the case, *i.e.*, whether the City had negligently altered the bottom step of the trash truck and thereby caused Appellee to stand on the hopper sill.

"[W]hile there is no *per se* test for determining what is 'an opinion on an ultimate issue,' an opinion upon the possibilities open to a party in a negligence case has been classified as an opinion on the ultimate issue of negligence." *Lewis v. Mellor*, 259 Pa.Super.Ct. 509, 520, 393 A.2d 941, 947 (1978), *allocatur granted*, March 1, 1979, *appeal discontinued*, October 21, 1980. In the present case Dr. Currie discussed the operation of the trash truck's compacting cycle, "buzzer" signal system (inactive at the time of Appellee's accident), added "T" bar ledge, and modified bottom step and then stated that the inverted slant of the bottom step plus the awkward positioning of the "T" bar ledge would act as "an inducement for [Appellee] not to use [the bottom step] and to step somewhere else" and would be "quite the reason for [Appellee's] being up in other places [*i.e.*, the hopper sill with which the compacting blade came into contact."

Citing *Collins v. Zediker*, 421 Pa. 52, 218 A.2d 776 (1966), and *Taylor v. Fardink*, 231 Pa.Super.Ct. 259, 331 A.2d 797 (1974), the City maintains that although Dr. Currie's testimony describing the structural modifications of the truck was competent and admissible, Dr. Currie's statement as to the impact of the modifications upon Appellee's behavior was an inadmissible conclusion as to an ultimate issue for the jury's determination, *i.e.*, whether the City had negligently altered the bottom step and thereby caused Appellee to stand on the hopper sill. "Jurors are ... impressed by scientific talk even though ... in [a] particular field ... they are as much at home as the scientist. The jury should be insulated ... from undue persuasion from the witness stand ...." *Zediker*, 421 Pa. at 55, 218 A.2d at 778.

However, *Fardink* and *Zediker* are factually distinguishable from the instant case. *Fardink* concerned not the testimony of an expert witness, but rather, the testimony of a lay eyewitness to a vehicular accident. Thus, the witness was not better qualified than the jury to render an opinion as to whether "the appellee had done everything that she could have done to avoid the accident: that appellee had not been negligent." *Id.*, 231 Pa.Superior Ct. at 263, 331 A.2d at 799. In *Zediker* an engineer offered expert testimony on the speed of a pedestrian involved in an accident. The Supreme Court of Pennsylvania held that such testimony was inadmissible because "[p]henomena and situations which are matters of common knowledge, may not be made the subject for expert testimony .... No experience could be more ordinary and within the range of a jury's comprehension than the speed of a walker. Everybody walks." *Id.*, 421 Pa. at 53–54, 218 A.2d at 777.

"Expert testimony is admissible when it involves explanations and inferences not within the ordinary training, knowledge, intelligence and experience of the jury .... Evidence of the custom or practice prevailing in a particular business in the use of methods, machinery and appliances is admissible ... to prove negligence or ... to disprove negligence." *Kubit v. Russ*, 287 Pa.Super.Ct. 28, 35, 429 A.2d 703, 706–07 (1981) (citation omitted).

In this instance Dr. Currie supplied information about the acceptably safe engineering design of an ordinary step and contrasted that design to the City's altered structure of the trash truck's bottom step. Unlike *Zediker*, the present case required the scientific explanation of matters beyond the jury's common knowledge, *i.e.*, the engineering configurations of steps. While the jury certainly had general familiarity with stairways, the jury lacked experience with the trash truck's altered bottom step which, according to Dr. Currie, had an abnormal, inverted construction.

The general rule is that a witness must testify as to "facts," and may not venture an "opinion" as to these facts. When, however, "mere descriptive language is

inadequate to convey to the jury the precise facts of a case or their bearing on the issues of the case, a witness may supplement his description by his opinions ...." *Taylor v. Fardink*, 231 Pa.Super.Ct. 259, 262, 331 A.2d 797, 799 (1974) .... "In several classes of questions, the line between the witness' judgment or opinion and his affirmation of fact is so indistinct that it cannot be marked out in practice." [*Graham v. Pennsylvania Co.*, 139 Pa. 149,] 158, [21 A. 151,] 152 [ (1891) ].

*Commonwealth v. Gay*, 269 Pa.Super.Ct. 164, 169, 409 A.2d 416, 418–19 (1979) (footnote deleted).

In *Gay* a police officer "testified that he ... confiscated a screwdriver from appellant ... and 'used the *same screwdriver* to re-open the front door' at [a burglarized] residence .... He further testified that the 'marks ... made from the [confiscated] screwdriver *matched* ... the marks ... made earlier on the door [of the burglarized residence].' " *Id.*, 269 Pa.Superior Ct. at 168–69, 409 A.2d at 418 (emphasis added to underscore alleged opinion testimony). Recognizing the "amorphous nature of the fact-opinion dichotomy," *Gay*, 269 Pa.Superior Ct. at 169, 409 A.2d at 419, this Court held that although the police officer's testimony consisted neither entirely of fact nor entirely of opinion, the officer's testimony was "more akin to ... a factual description of the two sets of marks. The fact finder was still free to determine whether the earlier marks were made with the same instrument and whether appellant was responsible for the earlier marks." *Id.*, 269 Pa.Superior Ct. at 170, 409 A.2d at 419. Thus, the officer's testimony was deemed admissible.

In *Freed v. Priore*, 247 Pa.Super.Ct. 418, 426, 372 A.2d 895, 899 (1977), *allocatur denied*, a medical expert testifying in a malpractice suit stated that having carefully examined the medical records, he considered that the doctor in question had "administered quality obstetrical care." The expert further declared that he did not "see any part in [the defendant-doctor's] treatment ... [which could be called] mistreatment or bad management." *Id.* This Court held

that although the expert's quoted statements were presented in the form of an opinion, they were admissible as being "merely a summary of [the expert's] prior testimony." *Id.*, 247 Pa.Superior Ct. at 427, 372 A.2d at 900. Furthermore, acknowledging that "comprehensive expert testimony [had been offered] over a period of several days," *id.*, we declared "it . . . hard to conceive that one sentence made by one expert would have such an overwhelming influence on the jury as to cause them to abandon their own judgment for that of [the expert]." *Id.* (footnote deleted).

■ Similarly, in the present case we hold that Dr. Currie's challenged statements were properly admitted by the trial court. They are admissible both as being akin to a factual description of the available standing area at the back of the trash truck, *Gay*, and as being merely a shorthand summary of Dr. Currie's prior testimony, *Freed.*[8]

■ Furthermore, "the fact finder was still free" to make an independent assessment of the testimony presented in order to ascertain the pertinent facts. *Gay*, 269 Pa.Superior Ct. at 170, 409 A.2d at 419. The trial court gave the jury a cautionary instruction regarding the nature of expert testimony. In charging the jury, the trial court stated that the testimony of Dr. Currie and the other expert witnesses at trial was to be treated in the following manner: "You look at their testimony carefully and understand that they

8. Since 1942, there has been a trend to abandon the rule that witnesses would not be permitted to give their opinions or conclusions upon an ultimate issue of fact . . . . 'This change in judicial opinion has resulted from the fact that the rule excluding opinion on ultimate facts in issue is unduly restrictive, pregnant with close questions of application and the possibility of misapplication, and often unfairly obstructive to the presentation of a party's case, to say nothing concerning the illogic of the idea that these opinions usurp the jury function.' McCormick on Evidence, pp 27–28.
*Freed*, 247 Pa.Superior Ct. at 427 n.8, 372 A.2d at 900 n. 8. *See Lewis v. Mellor*, 259 Pa.Super.Ct. 509, 393 A.2d 941 (1978), *allocatur granted*, March 1, 1979, *appeal discontinued*, October 21, 1980, wherein the common law rule prohibiting opinion testimony by lay witnesses was abandoned in favor of the federal rule embodied in Fed.R.Evid. 701 and 704, which admits opinion testimony where a judge decides that such testimony will be helpful and will not cause confusion or prejudice. *Id.*, 259 Pa.Superior Ct. at 522, 393 A.2d at 948.

are expressing opinions and it is necessary that you make an evaluation of those opinions. You are not bound by them at all, but you certainly consider them, because they come from people who are qualified in their particular areas."

We hold that the trial court's instruction conforms to the principles of *Freed* wherein we explained that

when an expert witness states his opinion, this testimony is to be received by the jury just as any other opinion testimony. The court and jury are not bound by an opinion of an expert. Expert testimony, if believed, merely proves, that, in light of the expert's general experience and his observations . . ., he had reached the conclusions announced. These opinions are to be considered with the other evidence; they may be rejected in whole or in part; the weight to be given them is for the jury.

*Id.*, 247 Pa.Superior Ct. at 426, 372 A.2d at 899–900.

The City's third argument on appeal is that the trial court should have granted the City's motion for a new trial because the jury awarded excessive damages to Appellee.

Appellate courts are properly reluctant to interfere with jury verdicts in personal injury cases, which verdicts are supported by the opinion and approval of the trial judge . . . . The granting or refusal of a new trial because of excessiveness is peculiarly within the discretion of the court below and we will not interfere, absent a clear abuse of discretion. We will not hold that a verdict is excessive unless it is " 'so grossly excessive as to shock our sense of justice . . . .' " [W]hile each case is unique and dependent upon its own special circumstances, the following factors, *inter alia*, are relevant in determining whether a particular verdict is excessive: (1) the severity of the injury, (2) whether plaintiff's injury is manifested by objective physical evidence instead of merely the subjective testimony of the plaintiff, (3) whether the injury will affect the plaintiff permanently, (4) whether the plaintiff can continue with his employment, (5) the size of

plaintiff's out-of-pocket expenses, and (6) the amount plaintiff demanded in the original complaint.

*Robert v. Chodoff*, 259 Pa.Super.Ct. 332, 366–67, 393 A.2d 853, 871 (1978) (citations omitted) (footnote deleted); *Fretts v. Pavetti*, 282 Pa.Super.Ct. 166, 422 A.2d 881 (1980).

Here, Appellee suffered the permanent loss of all the toes on his left foot. Appellee presented evidence of the continuous problems engendered by the amputation including difficulty in his maintaining stability, lifting objects, ascending a staircase, and walking long distances. In addition, Appellee asserted that since the amputation he has had continual back pain which has necessitated hospitalization and physical therapy and which prevents prolonged sitting and standing.

Appellee's medical expert explained that x-rays of Appellee's back

reveal a congenital abnormality which comprises a so-called unstable back, and ... this prior situation was made to become symptomatic as a result of a subtle low back strain that developed in the course of [Appellee's] recuperation from his foot injury and his limp .... [W]hile this man was recuperating from his foot problem, he was most certainly limping and that limp produced a certain strain on his back .... [Appellee is] going to have some back pain on and off from time to time .... It will respond to rests, some exercises .... He might one day require a corset .... He has a back that will give him some trouble from time to time, indefinitely.

Dr. Leshner, a vocational psychologist, testified on behalf of Appellee that Appellee's physical impairments would limit Appellee

to work of an unpressured routine nature.

He couldn't do bench work, because, with a bad back, he can't sit all day long.

But where he could alternately sit and stand, he could work in a supply room. He could be an inspector ... where he can alternately sit on a stool or stand.

He could be a general, routine clerical worker ....
He could work in a tool room ....

There is a whole class of jobs where ... he could alternately sit and stand and sustain an eight-hour day without any great stress or without any great pressure.

....

If he had not been injured, he could do heavier work, which would pay more money.

....

[If he had not been injured,] he could do a lot of heavy work, generally labor, machine operation and so on. These are jobs that pay between five and eight dollars an hour.

....

[T]hese light routine jobs he could perform ... would pay somewhere between three and a half dollars and five dollars an hour.

Dr. Leshner also addressed the effect of Appellee's prison record upon his future employability. "The prison record does not keep him from ultimately getting a job .... [M]y experience has been, those with extended prison records, particularly during adolescence, do tend to stabilize and ... get into employment .... My own experience in placing people with these ... problems indicates that he could ... get a job."

Somewhat corroborative of Dr. Leshner's opinion as to Appellee's employability despite a prison record was Dr. Leshner's testimony that while imprisoned Appellee had received a high school equivalency diploma and had taken courses in dry cleaning, carpentry, welding, and cooking.

Comparing the class of jobs available to Appellee in his present physical condition with the class of jobs that would have been available to Appellee in his pre-accident condition, Dr. Leshner estimated that the difference in annual earn-

ings between the two classes of jobs, using mean hourly wage figures for both classes, would be $5,200.[9]

The City asserts that because Appellee has been imprisoned and has not worked steadily, Dr. Leshner did not have an adequate basis for determining Appellee's lost earning capacity. But " ' "[t]he consideration of loss of earning capacity is not solely the comparative amount of money earned before or after an injury. The true test is whether or not there is a loss of earning power, and of ability to earn money." ' " *Wright v. Engle*, 256 Pa.Super.Ct. 321, 326, 389 A.2d 1144, 1147 (1978) (citations omitted).

The City emphasizes that Appellee's out-of-pocket medical expenses of $2,600 for hospitalization represent little more than one percent of the jury's verdict. However, "[m]ere disparity between the amount of out-of-pocket expenses and the verdict will not by itself provide sufficient basis to upset the award." *Murphy v. Penn Fruit Co.*, 274 Pa.Super.Ct. 427, 436, 418 A.2d 480, 485 (1980).

Finally, Appellee's medical expert stated that Appellee should have the calluses on his foot shaved by a podiatrist "every couple of months or so" and that such treatment would cost twenty-five or thirty dollars per visit.

■ Considering all of the foregoing evidence, we do not find that the jury's award of $220,000 (two hundred and twenty thousand dollars) is so extreme as to shock our sense of justice. Therefore, we hold that the jury's verdict is not excessive.

The City's last contention on appeal is that the trial court improperly ordered the City to pay Appellee damages for delay in accordance with Pa.R.C.P. 238.[10]

9. The parties agreed that Appellee's work life expectancy at the time of trial was thirty-five years. Projecting Appellee's annual lost earnings over a thirty-five-year period produces an anticipated loss of future earnings equalling $182,000.

10. In pertinent part Rule 238 (effective 120 days after December 16, 1978) states: "[I]n an action seeking monetary relief for bodily injury, ... the court ... shall (1) add to the amount of compensatory damages ... in the verdict of a jury ... damages for delay at ten (10)

The City maintains that payment by a municipality of damages in the form of prejudgment interest is barred by Section 404 of the Political Subdivision Tort Claims Act ("Act"), Act of November 26, 1978, P.L. 1399, *as amended, formerly* 53 P.S. § 5311.404, repealed by Section 333 of the Act of October 5, 1980, P.L. 693. Section 404 of the Act is captioned "Prejudgment interest" and states that "[n]o interest shall accrue prior to any entry of judgment."

However, Section 803 of the Act, *formerly* 53 P.S. § 5311.803, repealed by Section 333 of the Act of October 5, 1980, P.L. 693, restricts the Act's application to "all *causes of action* arising" sixty days after November 26, 1978. (Emphasis added).

In *Laudenberger v. Port Authority of Allegheny County*, 496 Pa. 52, 65–66, 436 A.2d 147, 154–55 (1981) (footnotes deleted), the Supreme Court of Pennsylvania acknowledged that Rule 238 created a new obligation for defendants but held that the rule did not thereby enlarge the substantive rights of plaintiffs.

The rule undeniably imposes an additional duty upon defendants in the form of prejudgment interest. But what is the essence of this duty? Rule 238 provides compensation to a plaintiff for delay in receiving the monetary damages owing as a result of a defendant's tort. This serves to indemnify the plaintiff for the money he would have earned on his award if he had promptly received it....

... Although the award for delay of time may be 'in the nature of interest,' in reality, it is merely an extension of the compensatory damages necessary to make a plaintiff whole .... The law of damages concerns the just administration of remedies for the disregard of rights recognized by substantive law, which is the definition, according to the Supreme Court of the United States, of procedural law ....

percent per annum, not compounded, which shall become part of the ... verdict ...."

■ Thus, the cause of action underlying the instant controversy is Appellee's suit in trespass seeking recompense for a bodily injury received on December 3, 1973, as a result of the City's negligent redesign of a trash truck. The award of damages under Rule 238 does not give Appellee a separate cause of action against the City, but rather, is concomitant to and derivative from Appellee's original complaint in trespass and merely serves to penalize the City for failing to attempt to settle that complaint without resort to judicial process. Consequently, Appellee's cause of action arose in 1973 and predates the effective date of the Political Subdivision Tort Claims Act.

Accordingly, we affirm the order of the Court of Common Pleas of Philadelphia County, dated July 3, 1981.