508 A.2d 298

**Charles W. HAWTHORNE, Sr., Administrator of the Estate of Richard Daniel Hawthorne, Deceased**

**v.**

**DRAVO CORPORATION, KEYSTONE DIVISION, Appellant**

**and**

**Borough of Industry.**

**Charles W. HAWTHORNE, Sr., Administrator of the Estate of Richard Daniel Hawthorne, Deceased, Appellant**

**v.**

**DRAVO CORPORATION, KEYSTONE DIVISION and Borough of Industry.**

Superior Court of Pennsylvania.

Argued Oct. 31, 1985.

Filed Feb. 21, 1986.

Reargument Denied April 28, 1986.

362

Oran W. Panner, Beaver, for appellant (at 42) and for appellee (at 69).

John A. Miller, Beaver, for appellant (at 69) and for appellee (at 42).

Before WIEAND, DEL SOLE and HESTER, JJ.

WIEAND, Judge:

During the early morning hours of November 11, 1974, Richard D. Hawthorne drowned when the car he was driving plunged into the Ohio River in an area then being dredged by the Dravo Corporation (Dravo). The administrator of Hawthorne's estate commenced wrongful death and survival actions against Dravo. He alleged that Dravo, in dredging too close to the shoreline, had negligently created a drop-off into deep water without warning. Dravo caused the Borough of Industry to be joined as an additional defendant. A first trial resulted in the entry of a compulsory nonsuit which this Court, on appeal, reversed. See: *Hawthorne v. Dravo Corp.*, 313 Pa.Super. 436, 460 A.2d 266 (1983). A second trial resulted in a jury verdict in favor of the decedent's estate and against Dravo in the

amount of one million dollars.[1] After post-trial motions had been denied, the trial court molded the verdict by adding delay damages of $224,381.43, and interest in the amount of $40,855.78. Judgment was entered on the molded verdict. Both parties appealed. Dravo alleges various trial errors which we will consider seriatim. The estate argues that the trial court's award of delay damages was inadequate.

Dravo contends initially that the verdict was against the weight of the evidence.

> [T]he decision to either grant or deny a motion for new trial [on grounds that the verdict was against the weight of the evidence] is within the sound discretion of the trial court and will be reversed on appeal only if the appellate court determines the trial court palpably abused its discretion. . . . Our Supreme Court has held that a new trial should be granted only where the verdict is so contrary to the evidence as to shock one's sense of justice. *Burrell v. Philadelphia Electric Co.*, 438 Pa. 286, 265 A.2d 516 (1970). A new trial should not be granted where the evidence is conflicting and the jury might have found for either party, nor where the trial judge would have reached a different conclusion on the same facts.

*Myers v. Gold*, 277 Pa.Super. 66, 69, 419 A.2d 663, 664 (1980). See: *Austin v. Ridge*, 435 Pa. 1, 255 A.2d 123 (1969); *Brown v. McLean Trucking Co.*, 434 Pa. 427, 256 A.2d 606 (1969); *Carroll v. Pittsburgh*, 368 Pa. 436, 84 A.2d 505 (1951); *Buck v. Scott Township*, 325 Pa.Super. 148, 472 A.2d 691 (1984); *Mattox v. City of Philadelphia*, 308 Pa.Super. 111, 454 A.2d 46 (1982); *Eldridge v. Melcher*, 226 Pa.Super. 381, 313 A.2d 750 (1973).

In the instant case the evidence showed that on the evening of November 10, 1974, decedent, accompanied by his girlfriend, Betsy Wardle, and two other passengers, drove a borrowed vehicle around Beaver County and into West Virginia. At approximately midnight, decedent drove to an area on the north bank of the Ohio River known as

---

1. A verdict was directed in favor of the Borough of Industry and is not challenged on appeal.

Maude's Landing in the Borough of Industry. Upon arriving, decedent parked the vehicle within six inches of the water's edge, facing the river. The group remained there for a brief period before making ready to depart. As decedent attempted to shift the engine's standard transmission into reverse, the vehicle drifted forward, entered the river and suddenly plunged into deep water. The three passengers were able to escape through a rear window of the automobile; however, decedent was unable to escape and drowned.

For many years prior to September, 1974, the area known as Maude's Landing had been used by members of the public, including the decedent, to launch boats, wash cars, and for swimming, fishing and other recreational activities. Prior to Dravo's dredging activities, the river bottom adjacent to Maude's Landing sloped gradually from the shoreline toward the center of the river for a distance of between thirty and fifty feet. In late September, 1974, Dravo began its dredging activities in the vicinity of Maude's Landing. Its operations had been authorized by two dredging permits, one having been issued by the United States Department of the Army Corps of Engineers and the other by the Pennsylvania Department of Environmental Resources. The dredging caused the creation of a steep drop-off into deep water at or near the river's edge.

Dravo did not deny these facts. It argued, however, that its dredging operations had been conducted consistently with its permits and in agreement with the limitations and restrictions thereof. Dravo also introduced evidence that, prior to the accident, its employees had erected a cable across the area of Maude's Landing which extended for almost the entire length of the cleared area at the shoreline. Attached to this cable, according to Dravo's evidence, were three large signs warning "Danger, Deep Drop Off." Hawthorne's evidence was to the contrary. Betsy Wardle testified that she did not see any such cable or signs at Maude's Landing on the night of the accident. In addition, Paul Walton, Jr., a former Dravo employee, testified that no

warning signs had been erected until after decedent's death. Indeed, neither cable nor warning signs were found in the area immediately following the accident.

Dravo's evidence that the dredge boat and barges were parked between fifty and eighty feet offshore from Maude's Landing and were fully lighted and visible from the shore was also contradicted by Hawthorne's evidence. Betsy Wardle testified that she did not see either dredge or barges on the night of the accident because the lights on the dredge were not lit. William Tichy, a member of the Industry Volunteer Fire Department, who arrived at the scene after emergency crews had been called, testified that he did not observe that the dredge had been parked offshore until it was brought to his attention by another person.

 Given the conflicting nature of the evidence, it cannot be said that the trial court palpably abused its discretion when it determined that the jury's verdict was not contrary to the weight of the evidence so as to require a new trial. A jury could have found from the evidence that Dravo knew or should have known of the use which had been made of the shore area at Maude's Landing and that Dravo was negligent in failing to give warning of the sharp drop-off which its dredging operations had created. In the absence of such warning, the jury could have further found that the decedent had not been guilty of contributory negligence in parking the vehicle close to the water's edge and in allowing it to drift forward into the water for a short distance as he attempted to put the transmission into reverse. Even though the decedent may have known that Dravo was conducting dredging operations offshore, the jury was not required to find that he was aware of the invisible drop-off which had been created close to the shoreline. Thus, the jury's verdict regarding the absence of contributory negligence was not shocking to the judicial conscience.

Dravo contends that it was error for the trial court to instruct the jury that there was a presumption that the

decedent had been exercising due care for his own safety at the time of the accident. The existence of such a presumption is unquestionably a part of the common law of this Commonwealth. See: *Groh v. Philadelphia Electric Co.,* 441 Pa. 345, 271 A.2d 265 (1970); *Skoda v. West Penn Power Co.,* 411 Pa. 323, 191 A.2d 822 (1963); *Rowles v. Evanuik,* 350 Pa. 64, 38 A.2d 255 (1944); *Yandrich v. Radic,* 291 Pa.Super. 75, 435 A.2d 226 (1981). Dravo urges us to conclude, nevertheless, that the presumption has outlived its usefulness and should be abandoned.

 The primary purpose of a court's charge to the jury is to apprise the members of the jury, in an understandable manner, of the legal principles by which they must decide the case. The law is well settled that the trial court is not required to use any prescribed language in performing this function. Indeed, for a party "to be entitled to a new trial [on the basis of erroneous jury instructions], the instructions complained of must be fundamentally in error, and it must appear that the erroneous instructions might have been responsible for the verdict." *McCann v. Amy Joy Donut Shops,* 325 Pa.Super. 340, 342, 472 A.2d 1149, 1150 (1984) (en banc). A new trial is also appropriate where the instructions, although perhaps not erroneously stating the law, have misled or confused the jury. See: *Takach v. B.M. Root Co.,* 279 Pa.Super. 167, 420 A.2d 1084 (1980); *McEwan v. Yellow Cab Co.,* 182 Pa.Super. 219, 126 A.2d 816 (1956). The presumption of a decedent's exercise of due care may not be the clearest method of apprising the jury that the party asserting the negligence of a decedent bears the burden of proving it and may indeed have outlived its usefulness. See: *Yandrich v. Radic, supra,* 291 Pa.Super. at 83, 435 A.2d at 230. Nevertheless, until it is abandoned by the Supreme Court, it cannot be said that a trial court commits error in instructing the jury regarding the effect of the presumption. Moreover, the instruction given by the court in this case was not such as to mislead or confuse the jury regarding the issue of the

decedent's contributory negligence. It does not require that a new trial be granted.

Dravo alleges numerous errors in the evidentiary rulings made by the trial court. The first of these pertains to a ruling which excluded evidence that prior to the accident the decedent had consumed alcohol and smoked marijuana.

Since *Critzer v. Donovan,* 289 Pa. 381, 137 A. 665 (1927), it has been the policy of the appellate courts of this Commonwealth that when recklessness or carelessness is at issue, proof of intoxication is relevant, but the mere fact of consuming alcohol is not admissible, being unduly prejudicial, unless it reasonably establishes intoxication.

*Cusatis v. Reichert,* 267 Pa.Super. 247, 249–250, 406 A.2d 787, 788–789 (1979) (en banc). See: *Billow v. Farmers Trust Co.,* 438 Pa. 514, 266 A.2d 92 (1970); *Morreale v. Prince,* 436 Pa. 51, 258 A.2d 508 (1969); *Vignoli v. Standard Motor Freight, Inc.,* 418 Pa. 214, 210 A.2d 271 (1965); *Cook v. Philadelphia Transportation Co.,* 414 Pa. 154, 199 A.2d 446 (1964); *Harvey v. Doliner,* 399 Pa. 356, 160 A.2d 562 (1960); *Fisher v. Dye,* 386 Pa. 141, 125 A.2d 472 (1956); *Balla v. Sladek,* 381 Pa. 85, 112 A.2d 156 (1955); *Ackerman v. Delcomico,* 336 Pa.Super. 569, 486 A.2d 410 (1984); *Emerick v. Carson,* 325 Pa.Super. 308, 472 A.2d 1133 (1984); *Schwarzbach v. Dunn,* 252 Pa.Super. 454, 381 A.2d 1295 (1977); *Selby v. Brown,* 250 Pa.Super. 134, 378 A.2d 862 (1977); *Sentz v. Dixon,* 224 Pa.Super. 70, 302 A.2d 434 (1973); *Kriner v. McDonald,* 223 Pa.Super. 531, 302 A.2d 392 (1973).

■ In the instant case, the evidence which Dravo sought to introduce at trial involved not only the consumption of alcohol but also the ingestion of marijuana by the decedent. In determining whether the trial court erred, we accept the rule pertaining to the consumption of alcohol and apply it to the use of both alcohol and marijuana in the instant case. The same reasons for excluding evidence of alcohol consumption where intoxication is not proved apply with equal, if not added, force to situations involving the use of mari-

juana. Where there is evidence that a driver's use of marijuana affected his or her ability to operate a motor vehicle safely, that evidence is relevant and admissible. However, where it cannot be established that the use of marijuana rendered a driver unfit to drive or impaired his or her ability to drive safely, the use of marijuana is inadmissible to prove recklessness or carelessness. In these situations the prejudicial impact of the evidence clearly outweighs any probative value that it may have.

In the instant case, Dravo argues that its evidence of the decedent's use of marijuana and consumption of alcohol prior to the accident would have reasonably established that he was unfit to drive. An examination of Dravo's offer of proof, however, demonstrates that the trial court did not err in excluding the evidence.

■ Dravo offered to prove that decedent had shared two or three marijuana cigarettes with three other persons between 6:00 and 8:00 p.m. on the evening preceding the accident and that at or about 10:30 p.m., he had consumed two or three glasses of draft beer.[2] It was not until 12:15 a.m. on the following morning that the vehicle plunged into the river. Dravo offered to show by an expert in toxicology, Dr. Charles L. Winek, that the combined effect of alcohol and marijuana reduces normal judgment with respect to time and distance, as well as one's concern for safety. Significantly, however, the offer of proof also contained reference to a statement by Dr. Winek that the effect of the use of marijuana would continue only for three to four hours. Given this fact, which was a part of the offer of proof, the decedent's use of marijuana more than four hours prior to the accident became irrelevant. This prior use of marijuana could not have affected the decedent's ability to drive safely at the time of the accident, for its effects would have been dissipated by the passage of

**2.** In its brief, Dravo implies that decedent also consumed some malt liquor on the night of the accident. This, however, is not supported by Dravo's offer of proof in which Dravo stated that Betsy Wardle would testify that only the two young ladies in the car consumed the quart of malt liquor which the decedent had purchased.

time. Therefore, the evidence was properly excluded by the trial court.

■ Evidence of the decedent's consumption of several glasses of beer at or about 10:30 p.m. was also excluded on the grounds that it was irrelevant. That the decedent consumed two or three glasses of draft beer and had a blood alcohol level of .057% was unquestionably insufficient to prove intoxication. See: 75 Pa.C.S. § 1547(d)(2) (a blood alcohol level in excess of .05% but less than .10% does not give rise to any presumption that the person tested was under the influence of alcohol). The trial court did not err in excluding this evidence.

Dravo next contends that it was error for the trial court to refuse to allow a former Dravo employee, Fred Seiler, to explain to the jury the meaning of the following language contained in the dredging permit issued to Dravo by the Pennsylvania Department of Environmental Resources.

This permit is only valid for channel dredging no closer than the depth of dredging, but no closer than 25 feet from the channel shorelines or island shorelines at normal pool elevations.

(N.T. 5/21/84 at 363). Hawthorne had read this paragraph into evidence as part of his case in chief and had argued that by altering the river bottom within a few feet of the riverbank, Dravo had violated this provision of its permit. Dravo wished to show by Seiler's testimony that the limitation in its permit meant only that the ladder which did the digging could not be located closer than twenty-five feet from the shore. Dravo contended that this provision of the permit did not mean that the river bottom could not be disturbed within twenty-five feet of the shoreline. It must be conceded, of course, that the offered testimony was relevant. The issue, however, is whether Seiler was qualified to testify concerning the meaning of this provision in the permit.

It is a basic tenet of the law of evidence that one who intends to testify as "to his inference or opinion in matters requiring special training or experience to understand, must

be qualified as an expert in the field." *McCormick on Evidence* § 69, at 167 (3d ed. 1984). The decision regarding whether a particular witness qualifies as an expert rests in the sound discretion of the trial judge, and will not be reversed in the absence of a clear abuse of that discretion. See: *Klyman v. Southeastern Pennsylvania Transportation Authority,* 331 Pa.Super. 172, 177, 480 A.2d 299, 302 (1984); *Tyus v. Resta,* 328 Pa.Super. 11, 26, 476 A.2d 427, 435 (1984); *Pratt v. Stein,* 298 Pa.Super. 92, 152, 444 A.2d 674, 706 (1982).

An expert witness has been defined as a person who possesses knowledge not within the ordinary reach and who, because of this knowledge is specially qualified to speak upon a particular subject.... [A] witness who, by his own testimony, shows that he has no experience or special knowledge of the matter at issue would be incompetent to testify as an expert.

*Erschen v. Pennsylvania Independent Oil Co.,* 259 Pa.Super. 474, 477–478, 393 A.2d 924, 926 (1978). See: *Griffith v. Clearfield Truck Rentals, Inc.,* 427 Pa. 30, 41, 233 A.2d 896, 902 (1967); *Reed v. Hutchinson,* 331 Pa.Super. 404, 410, 480 A.2d 1096, 1099 (1984); *Tyus v. Resta, supra,* 328 Pa.Super. at 26, 476 A.2d at 435; *Pratt v. Stein, supra,* 298 Pa.Super. at 152–153, 444 A.2d at 706.

■ The permit containing the restriction in the instant case had been issued in 1974. Seiler testified that from approximately 1968 to 1972, he had been directly responsible for making Dravo's applications for permits to DER and the Army Corps of Engineers. In 1972, however, his duties had been altered, and thereafter he was no longer directly involved in Dravo's river dredging. Instead, he was involved in obtaining permits for the construction of a sand and gravel pit in the Georgetown area. He conceded that the language in issue had not appeared in dredging permits with which he had had experience. He was familiar only with language in earlier permits which had provided that dredging operations should not affect the riverbank above the waterline. The trial court concluded that Seiler

did not have special knowledge or expertise sufficient to allow him to testify as an expert regarding the twenty-five foot limitation in the Dravo permit in question. Under the circumstances disclosed to the trial court, we cannot say that its ruling was erroneous or constituted an abuse of discretion.

■■■■■ We agree with Dravo that the trial court was incorrect when it permitted an averment in Dravo's complaint against the additional defendant to be used to impeach a non-party witness who had had no responsibility for the averments in the complaint. Clarence Nessleroad, the dredge boat captain, testified that his workers had erected a cable across the bank at Maude's Landing and had hung signs thereon warning of a steep drop-off. On cross-examination, the trial court permitted plaintiff's counsel to read into evidence a portion of a pleading in which Dravo had averred that the shoreline at Maude's Landing was unprotected by any guardrails or other barriers. Nessleroad was not a party to the action, and the use of the pleading to impeach his testimony was improper. The error, however, was harmless. Even if the trial court had refused to allow Hawthorne to use the pleading to impeach Nessleroad's testimony on cross-examination, this portion of the pleading was admissible as an admission by Dravo.

■■■ Similarly, it was harmless to receive into evidence a portion of Nessleroad's deposition as substantive evidence when he was present in court and available to testify. Nessleroad later testified in person as a Dravo witness and could have been asked to explain or even repudiate any factual testimony in his depositions which Dravo found damaging. This ruling, even if erroneous, did not require that a new trial be granted.

Dravo next contends that the trial court erred when it refused to permit Larry Joy, a former Dravo employee, to explain on redirect examination his reason for testifying voluntarily. On direct examination, Dravo's attorney had asked Joy if he was pursuing a Jones Act claim against

Dravo. Joy responded affirmatively. On cross-examination, the following colloquy occurred:

Q. Now, you say you have a Jones Act claim against Dravo?

A. Yes, sir.

Q. That case isn't settled yet, is it?

A. No....

. . . .

Q. It is an open claim right now, isn't it?

A. Yes, sir.

(N.T. 5/21/84 at 777–778). On redirect examination, Dravo attempted to elicit from Joy his reasons for volunteering to testify in the instant case. When an objection was raised, a sidebar conference was held, at which Dravo explained that Joy would testify that he had volunteered to testify only after one of Hawthorne's attorneys had asked him if he would testify that Dravo's barge and dredge had been turned straight into the shore at Maude's Landing. Joy had responded to Hawthorne's attorney, according to the offer of proof, that he would not testify to that because it was not true. Joy volunteered to testify for Dravo several weeks later, he would say, because "he wanted to make sure that everyone knew the truth." (N.T. 5/21/84 at 779). The trial court ruled that this testimony was beyond the scope of cross-examination and disallowed it.

■ The scope of redirect examination is a matter which is vested in the discretion of the trial court. In general, however, "the practice is uniform that [a] party's examination is normally limited to answering any new matter drawn out in the next previous examination of the adversary." *McCormick on Evidence* § 32, at 69 (3d ed. 1984). In the instant case, the fact that Joy had a Jones Act claim against Dravo was not brought out for the first time on cross-examination. Both the fact that the claim had been in existence and any implication that his testimony may have been motivated by the status of that claim were elicited from the witness by Dravo's own attorney on direct examination. Hawthorne's reiteration of the existence of Joy's claim

against Dravo on cross-examination, therefore, was not a "new" matter. The testimony, moreover, would have raised an issue that was collateral to the principal issue in the case. It cannot be said, therefore, that the trial court abused its discretion when it disallowed Joy's testimony pertaining to a pre-trial conversation with one of the attorneys for the plaintiff.

Dravo also asserts that the trial court erred when it permitted Gerald Weakland, a witness called by the plaintiff, to testify on redirect examination to a conversation which he had had with Phillip Johnson, a Dravo witness. Weakland was a former employee of John Johnson, the owner of a towboat which had been used to service the Dravo dredge at Maude's Landing at or about the time of decedent's accident. On direct examination Weakland testified, inter alia, that Dravo had known that it was dredging within a few feet of the shore at Maude's Landing, and had been warned that someone might be injured as a consequence thereof. On cross-examination, Dravo's counsel inquired whether Phillip Johnson, another towboat owner who had employed Weakland, had fired Weakland for stealing. Weakland denied it. On redirect examination the trial court permitted Weakland to testify that at or about the time he ceased working for Johnson, he told Johnson that he, Weakland, had been named as a witness in this case. According to Weakland, Johnson told him to say that it was too long ago and that he could not remember anything.

■ Dravo argues that this testimony was inadmissible as hearsay. However, Johnson's statement clearly was not offered to prove the facts asserted therein, i.e., that the incident occurred so long ago that Weakland could not remember anything about it. It was instead offered to prove that Johnson had made the statement. This testimony was not hearsay. Whether it was relevant has not been argued, and with respect thereto we express no opinion.

■ Finally, Dravo argues that the amount of the verdict was excessive and not supported by the evidence. "The

granting or refusing of a motion for a new trial because of excessiveness is peculiarly within the discretion of a trial court and will not be interfered with by this court unless the record discloses a clear abuse of discretion." *Connolly v. Philadelphia Transportation Co.*, 420 Pa. 280, 287, 216 A.2d 60, 64 (1966). See: *Tonik v. Apex Garages, Inc.*, 442 Pa. 373, 275 A.2d 296 (1971); *Albert v. Alter*, 252 Pa.Super. 203, 381 A.2d 459 (1977). In the absence of a showing that the amount of damages was influenced by caprice, prejudice, partiality, corruption or some other improper influence, "we will only consider the verdict excessive if it shocks our sense of justice." *Walasavage v. Marinelli*, 334 Pa.Super. 396, 409–410, 483 A.2d 509, 516 (1984); *Pratt v. Stein*, 298 Pa.Super. 92, 139, 444 A.2d 674, 699 (1982). See: *Albert v. Alter, supra.*

> Generally under Pennsylvania law, damages need not be proved with mathematical certainty, but only with reasonable certainty, and evidence of damages may consist of probabilities and inferences.... Where the amount of damage can be fairly estimated from the evidence, the recovery will be sustained even though such amount cannot be determined with entire accuracy.... It is only required that the proof afford a reasonable basis from which the fact-finder can calculate the plaintiff's loss.

*Delahanty v. First Pennsylvania Bank*, 318 Pa.Super. 90, 119, 464 A.2d 1243, 1257–1258 (1983).

In the instant case, the evidence showed that at the time of his death the decedent had been employed as a laborer by Salvator Ruggeri, who operated a plumbing, heating and air conditioning business. Ruggeri testified that decedent had worked for him approximately three months before the accident occurred. Decedent's duties were those of a helper to journeyman plumbers. He had been paid a minimum wage of $3.00 per hour. Based upon this information, Dr. Reuben E. Slesinger, a professor of economics at the Uni-

versity of Pittsburgh, calculated the economic loss during the decedent's life expectancy to be $497,875.00.

■ Ruggeri also testified that decedent had been interested in advancing in the plumbing business and had inquired on several occasions about joining the Plumbers' and Steam Fitters' Union. Ruggeri expressed the opinion that decedent had possessed an aptitude which would have enabled him to advance in the plumbing business. If he had become a journeyman plumber, Ruggeri said, the decedent would have earned an hourly wage of approximately $21.00. Dr. Slesinger testified that if decedent had become a journeyman plumber earning $21.00 per hour, the total loss to the estate would have been approximately one million dollars. In view of this evidence, it cannot be said that the jury's verdict was either unsupported by the evidence or excessive.

■ Pa.R.C.P. 238(a)(1) provides as follows:

[I]n an action seeking monetary relief for bodily injury, death, or property damage, of any combination thereof, the court ... shall ... add to the amount of compensatory damages ..., damages for delay at ten (10) percent per annum, not compounded, which shall become part of the ... verdict....

Where, as here, the action was pending on the date that Rule 238 became effective, delay damages must be calculated from October 15, 1979, six months after the effective date of the Rule. See: Pa.R.C.P. 238(f).

In computing delay damages in the instant case, the trial court excluded the period between December 5, 1980, the date on which the trial court entered a compulsory nonsuit in Dravo's favor, and April 22, 1983, the date on which this Court remanded the case for retrial.[3] The decedent's administrator argues that this was error. We disagree.

3. The trial court calculated the delay damages as follows:

In *Barris v. Bob's Drag Chutes & Safety Equipment, Inc.*, 717 F.2d 52 (3d Cir.1983), the Court of Appeals for the Third Circuit was faced with a similar issue and concluded that Rule 238 should not be applied to the period of time from the date the district court directed a verdict in defendant's favor to the date the Court of Appeals ordered a new trial. The Court examined the purposes of Rule 238 and determined that the primary objective of the Rule is to encourage pre-trial settlements, thereby lessening congestion in the courts. *Id.* at 56. See: *Laudenberger v. Port Authority of Allegheny County*, 496 Pa. 52, 59–60, 436 A.2d 147, 151 (1981); *Berry v. Anderson*, 348 Pa.Super. 618, 502 A.2d 717 (1986). In light of this purpose, the court reasoned:

> So long as the ultimate outcome of the case is reasonably in doubt the rule operates as an incentive for the defendant to consider seriously settlement as an alternative to a stalwart defense. Once the defendant obtains a favorable final judgment from the trial court, however, he has a reasonable basis to believe that the ultimate outcome is considerably less problematic. The defendant will quite rightly refrain from initiating any settlement activity and the burden shifts to the plaintiff to perfect an appeal and to persuade the appellate court that reversible error occurred. At this point ... the operation of Rule 238 no longer serves its purpose and should not be applied.

*Barris v. Bob's Drag Chutes & Safety Equipment, Inc., supra* at 56–57.

■ We agree with this view. Dravo was entitled to rely on the validity of the compulsory nonsuit entered by the trial court. Only after it had been vacated and the case remanded for trial did the defense return to its original

1. For the period of October 15, 1979 to December 5, 1980, at the rate of ten (10%) percent per year — $114,245.49

2. For the period of April 22, 1983 to May 29, 1984, at the rate of ten (10%) percent per year — $110,135.94

$224,381.43

status of uncertainty. At that time the purpose of Rule 238 became once again applicable. The trial court did not err when it excluded from its calculations the period between the entry of the compulsory nonsuit in Dravo's favor and the vacating of the judgment of nonsuit by the appellate court.

Judgment affirmed.