**Commonwealth v. Hawkins**

*John F. Haugh, assistant district attorney,* for the Commonwealth.

*J. David MacVeigh,* for defendant.

CASSIMATIS, *J.,* September 17, 1992—A jury found the defendant guilty of simple assault. Defendant filed his motion for new trial, alleging the court erred in admitting evidence that the defendant was passed out and intoxicated when arrested in his home and in refusing to admit evidence, in the form of a letter from Children & Youth Services of York County, informing the defendant that the report of suspected abuse in which he was named as a subject was determined to be unfounded. The motion for new trial will be granted.

The evidence at the trial established that on March 13, 1992, 12-year-old Christopher Norris was visiting at his friend's house, Ronald D. Hawkins III, when Ronald's father, the defendant, challenged him to a fight. During the ensuing assault the defendant's son was kicked about the head causing injuries. When he had completed his assault on his son, the defendant challenged Chris Norris. He declined and the defendant responded that "he must not have any balls."

Upon witnessing this attack, Chris Norris gathered his belongings and fled the house. He ran to his own house where he reported this incident to his father, James Norris.

James promptly telephoned the police and then proceeded to the defendant's house. When he arrived there he met with the defendant's son who assured him everything was okay. He promptly changed this, however, becoming agitated and emotional. James Norris then took the defendant's son back to his house to await the arrival of the medical personnel.

Ronald D. Hawkins III, was transported to Memorial Hospital where he was examined and treated by Dr. Nancy Fitch. During the course of this examination, Ronald advised Dr. Fitch that his father had kicked him in the right ear and punched him in the eye. Dr. Fitch observed a contusion above his right eye and a patecheal contusion around his neck, injuries consistent with the history provided.

Officer Rick Magee and Corporal Mark Birchfield of the Northern York County Regional Police Department also responded to the scene. They were led to the defendant's house by the defendant's wife, where they found the defendant passed out and apparently in an intoxicated state. On the information they received, the officers placed the defendant under arrest.

The issues in this case are:

I. Whether the court erred in admitting evidence that the defendant was passed out and intoxicated when arrested in his home?

II. Whether the court erred in refusing to admit a letter from Children & Youth Services which noted that their agency was not making an indicated finding in this case?

## DISCUSSION

With respect to the first issue, Corporal Mark Birchfield of the Northern York County Regional Police Department, testified that at 4:14 p.m. he arrived at defendant's residence. He found the defendant asleep on the sofa. Corporal Birchfield then testified "Upon then contacting Mr. Hawkins, he appeared to be very intoxicated, bloodshot eyes, slurred speech, somewhat argumentative. Just, in my experience, the typical state of being intoxicated." He further testified that he could smell an intoxicant upon defendant's person but did not look for any alcohol in the vicinity or in the area where the defendant was found. The assault by the defendant on his son was observed by Chris Norris very shortly after he entered the defendant's house, around 3:30 p.m.

It is the crime of simple assault under Crimes Code §2701(a), if a person: "(1) attempts to cause or intentionally, knowingly or recklessly; causes bodily injury to another."

Defendant argues the court abused its discretion in admitting evidence of his intoxication where that was not raised as a defense. He then goes on to say "Assuming, arguendo, that evidence of the defendant's intoxication was relevant, its relevance was outweighed by the risk of prejudice resulting from the jury's hearing that evidence."

On the other hand, the Commonwealth argues that evidence of the intoxication is relevant because it tends to establish a fact material to the case or it tends to make a fact at issue more or less probable and:

"In the instant case a theory supporting the defendant's innocence was that the injuries inflicted upon Ronald Hawkins III, were accidental and incidental to mutual horse play which he and the defendant were engaged in. The Commonwealth's position, however, was that the injuries were inflicted as a result of a deliberate and reckless act by the defendant.

"The defendant's conduct shortly after the infliction of these injuries were extremely relevant in determining the defendant's state of mind at the time of the act. Had the innocent theory of an accident been correct, then it could be argued that the jury would have expected some evidence of the defendant showing some concern for his son as he was ambulated to the hospital. Conversely, his advanced state of intoxication shortly after the assault is equally dispositive of his concern for his son and his state of mind at the time of the assault. Evidence of the defendant's intoxication establishes the defendant's intentional or reckless state of mind as more probable than not at the time of the assault and therefore was properly admitted."

We do not agree with the Commonwealth's analysis, finding it much too tenuous. We see no link between defendant's intoxication and his intentional state of mind. On the other hand, we do note that in civil cases in Pennsylvania the general rule is: "[W]hen recklessness or carelessness is at issue, proof of intoxication is relevant, but the mere fact of consuming alcohol is not admissible, being unfairly prejudicial, unless it reasonably establishes intoxication." *Cusatis v. Reichert,* 267 Pa. Super. 247, 249-50, 406 A.2d 787, 789 (1979).

We conclude that in a criminal proceeding, as in a civil proceeding, proof of intoxication is relevant to prove recklessness in a charge of simple assault under section 2701(a)(1) but does not bear on the intentional state of mind.

"Evidence which tends to establish some fact material to the case, or which tends to make a fact at issue more or less probable, is relevant." *Commonwealth v. Scott,* 480 Pa. 50, 54, 389 A.2d 79, 82 (1970), *appeal after remand,* 496 Pa. 188, 436 A.2d 607 (1981). We fail to see how defendant's intoxication establishes some fact material to defendant's state of mind being intentional or that evidence of such intoxication would tend to make defendant's intentional state of mind more or less probable. This is not a case where defendant is asserting that his intoxicated state precluded him from having an intentional state of mind. This is a case of the Commonwealth introducing evidence of defendant's intoxication.

As we have concluded, the proof of intoxication is relevant in this criminal proceeding to prove recklessness in a charge of simple assault under section 2701(a)(1), we move on to the next question: how much evidence is necessary to reasonably establish that the person was intoxicated? This is, of course, a preliminary question of fact.

In *Cusatis, supra,* the court admitted evidence of a blood alcohol content of .14 tested one hour after the accident where there was also evidence that the person had with another person been drinking during the evening, both having consumed about three-quarters of a quart of wine between 7:30 p.m. and the time of the accident; and additionally, at some time between 10:30 and 11:30

p.m., they had two bottles of beer a piece at a local tavern. The trial court ruled that any testimony on the question of the person's intoxication must be excluded. The Superior Court reversed.

In *Vignoli v. Standard Motor Freight Inc.*, 418 Pa. 214, 210 A.2d 271 (1965), the testimony was that the person had consumed two bottles of beer and had the odor of alcohol on his breath at the time of the accident. The Supreme Court affirmed the lower court's refusing to admit the testimony stating:

"The trial court wisely heard the testimony relative to Crise's [defendant's employee] alleged intoxication out of the jury's hearing. In circumstances where the jury could not reasonably reach a finding of intoxication, it is highly prejudicial to permit it to hear evidence bearing on the subject." *Id.* at 218, 210 A.2d at 273.

In *Morreale v. Prince*, 436 Pa. 51, 258 A.2d 508 (1969), the court excluded evidence that a person was in a bar shortly before an accident stating:

"In terms of the possible prejudice there is no functional difference between evidence that a litigant was drinking and evidence that he was in a bar. Both pieces of evidence give rise to the insidious inference that the individual involved was intoxicated or under the influence of alcohol, which inference, without some proof of intoxication, has no role to play in any case." *Id.* at 53, 258 A.2d at 508-509.

In *Emerick v. Carson*, 325 Pa. Super. 308, 472 A.2d 1133 (1984), the evidence consisted of a blood/alcohol test performed on the person two or three hours after the accident to the pedestrian revealing a blood/alcohol

level of .185 percent, and an expert witness opined that the person's blood/alcohol level was about .220 percent at the time of the accident and that "the effect of a .20 percent blood/alcohol level is euphoria, loss of restraint, loss of motor coordination, and impairment of rational decision-making ability." There was also evidence that the person narrowly avoided being struck by another car, yet remained in the middle of the dark roadway, in an extremely hazardous position which could lead to the inference that his behavior before the accident was not that which would be expected of a reasonably prudent and sober person under the circumstances. The person also admitted that he had "quite a bit to drink" one-half hour before the accident. There was also detected a strong odor of alcohol on the person's breath at the time of the accident. The Superior Court affirmed the trial court's admission of this testimony.

In *Hawthorne v. Dravo Corp., Keystone Div.*, 352 Pa. Super. 359, 508 A.2d 298 (1986), *appeal den.*, 521 A.2d 932 (1987), the court affirmed the exclusion of evidence that the decedent consumed two to three glasses of draft beer and had a blood/alcohol level of .057 percent prior to drowning. This was held insufficient to prove intoxication, the court noting that the Motor Vehicle Code 75 Pa.C.S. §1547(d)(2) provides that a blood/alcohol level in excess of .05 percent but less than .10 percent does not give rise to any presumption that the person tested was under the influence of alcohol.

In *McKee by McKee v. Evans*, 380 Pa. Super. 120, 551 A.2d 260 (1988), the court affirmed the trial court permitting evidence that he had admitted that he was "probably intoxicated," had consumed seven or more 12-

ounce glasses of beer at a party within a three-hour period immediately prior to the accident, and his blood/alcohol level was "probably more than .10 percent."

The Commonwealth argues that we should give great credence to the opinion of Corporal Mark Birchfield that the defendant "appeared to be very intoxicated" arguing that lay persons are permitted to express opinions on the state of intoxication of other persons. We find no fault with the officer being able to express this opinion. The issue is whether that testimony together with the other factual predicate is sufficient for the jury to infer that the defendant was intoxicated, so as to be relevant on the issue of recklessness.

We note that in the instant case, there was no testimony establishing the defendant's state of intoxication other than at 4:14 p.m. Specifically, Chris Norris and the defendant's son, who is the victim, and observed the defendant at the time of the fight, about 3:30 p.m., nor did Chris Norris' father, James Norris, who was summoned to the defendant's home by his son and who then telephoned the police, and thus observed the defendant some time between 3:30 p.m. and the time he called the police, testify at all concerning the defendant's state of intoxication.

We thus, conclude that the evidence in this case is not sufficient to establish that at the time of the fight, about 3:30 p.m., the defendant was intoxicated. It was error for the court to have permitted this testimony to be presented to the jury.

We must now determine whether the erroneous admission of the testimony concerning defendant's intoxication was harmless error.

"In the seminal case of *Commonwealth v. Story,* 476 Pa. 391, 406, 383 A.2d 155, 162 (1978), this court stated that 'an error can be harmless only if the appellate court is convinced beyond a reasonable doubt that the error is harmless.' The burden of establishing that the error was harmless beyond a reasonable doubt rests with the Commonwealth. Id. at 406, 383 A.2d at 162, n.11.

"Error is considered to be harmless where: (1) the error did not prejudice the defendant or the prejudice was de minimis; or (2) the erroneously admitted evidence was merely cumulative of other, untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict. Id. at 410-15, 383 A.2d at 164-66." *Commonwealth v. Williams,* 524 Pa. 404, 573 A.2d 536, 538-539 (1990).

In order to determine whether the admissibility of the evidence of defendant's intoxication was de minimis, we must assess whether the Commonwealth has shown beyond a reasonable doubt that the error did not influence the jury. The defendant's state of mind was a critical issue in this case. There was no direct testimony concerning his state of mind. The defendant did not testify at the trial nor were there any admissions by the defendant offered at the trial through testimony of other witnesses.

Thus, we must look at the circumstantial evidence, that is the inferences flowing from the testimony of the eye witnesses. There were two. The first was Christopher Norris, a 12-year old friend of the victim, Ronald Hawkins III. He described defendant's conduct as follows: "He

(the defendant) told his son (Ronald Hawkins III) that he had 'to learn how to fight the somethings in the world or—I don't know,' well, he hurled him around the neck. He had him in like a lock sort of and twisted it, and he hurt his nose in some way. I don't know how he hurt his nose. I just saw that. That's about all. Then I saw him turn and he got up and blew his nose and he was crying"; the defendant told his son "Not to be a wuss"; the defendant "started back up at it, and I don't know. I forget because it's been awhile. I remember he was on the floor crying, down like that, and his father kicked him in the head," the witness adding that he guesses the son/victim got onto the floor trying to defend himself; and the defendant asked the witness, Christopher Norris, if he wanted to learn how to fight, the reply being no, the defendant said: "'I guess you don't have the balls for it.' I said: 'I guess I don't.'"[1]

---

1. At the conclusion of Christopher Norris' testimony, the court questioned Christopher to restate what he observed. The testimony is as follows:

*Examination by the court:*

Q. "I'm not quite sure, Chris, that I heard everything. What was the first thing that you saw Ronald's father do to him by way of touching him or talking to him?"

A. "Got to learn how to fight."

Q. "And what did Ron say?"

A. "Okay."

Q. "And what did his father then say or do?"

A. "Swing a fake punch to him and Ronald would jump back."

Q. "Did he—when he swung at him, did he come into contact with Ron?"

A. "He just went like that."

Q. "Then what happened?"

A. "Then he grabbed him. He went up and grabbed him and put him on the floor."

On the other hand, defendant's son, Ronald Hawkins III, testified as follows:

Q. "Ronald, this is your father right over there?"

A. "That's right."

Q. "And are you happy about being here today?"

A. "No."

Q. "Do you remember something that happened back on March the 13th?"

Q. "How did he do that?"

A. "He walked up and put his arm around his neck and brought him on the floor like that."

Q. "Was he saying anything to him?"

A. "Not that I know of."

Q. "What happened next?"

A. "He started crying then. Ronald started crying. He said his nose hurt."

Q. "Okay. Father say or do anything?"

A. "His dad? Ronald's dad?"

Q. "Yes."

A. "He said don't be a wuss."

Q. "Can you spell that?"

A. "W-u-s-s, I guess."

Q. "Then what happened?"

A. "Then he came over to me and asked me if I wanted to learn how to fight, and I said no. He said 'I guess you don't have the balls for it.' I said 'I guess I don't.'"

Q. "Then what happened next? Did you leave at that point or did you stay?"

A. "Then Ronald's dad kicked him in the head."

Q. "Kicked him in the head?"

A. "Yes."

Q. "And you described where he was on the floor and his position?"

A. "Yes."

Q. "Then after that happened is that when you left?"

A. "That's when I grabbed my bags and ran out."

*A.* "About half."

*Q.* "Did your friend Chris come up to your house that day?"

*A.* "Yeah."

*Q.* "You and Chris are friends, aren't you?"

*A.* (The witness nodded head affirmatively).

*A.* "Yes."

*Q.* "All right. Can you tell us what happened on that day, March 13, when Chris was up at your house?"

*A.* "Me and my dad were wrestling. He asked me if I wanted to wrestle. I said yeah."

*Q.* "What happened when you and your dad were wrestling?"

*A.* "He just put me in a move. I slipped. My head came out from underneath. My head come out from under him. I hit my head on the table."

*Q.* "What kind of table did you hit your head on?"

*A.* "A coffee table."

*Q.* "Did you get hurt as a result of that?"

*A.* "Not really, I didn't want to go."

*Q.* "You didn't want to go where?"

*A.* "With the ambulance. I was okay."

*Q.* "You went in an ambulance to the hospital?"

*A.* "I had to."

*Q.* "You had to leave?"

*A.* "Whichever cop said you got to go."

*Q.* "You don't like the police officers, do you?"

*Mr. MacVeigh:* "Objection, relevance."

*The witness:* "I hate their guts."

*The court*:   "Sustained."

*By Mr. Haugh:*

*Q.*   "When you got to the hospital, you had to talk to the doctor, didn't you, the doctor that took care of you?"

*A.*   "I guess."

*Q.*   "You told the doctor what had happened to you?"

*A.*   "I don't know if I did or I didn't.  It's been awhile. I think I did."

*Q.*   "Ronald, is it fair to say you feel close to your father?"

*A.*   "Yeah."

*Q.*   "You like your father, don't you?"

*A.*   "Uh-huh, what's wrong with him?"

*Mr. Haugh*:   "May I have a moment, your honor?"

"Ronald, answer any questions that Mr. MacVeigh may have."

*The witness*:   "Yeah."

*Cross-examination by Mr. MacVeigh:*

*Q.*   "Did your dad swing a fake punch or two at you?"

*A.*   "To show me how to block, yeah."

*Q.*   "Showed you how to block."

*A.*   "Yeah, it wasn't a hard one, just one when I went to block it."

Clearly, the erroneously admitted testimony is not admissible under the second ground set forth in *Story, supra*, that it was merely cumulative of other untainted evidence which was substantially similar to "the erroneously admitted evidence."  Nor do we view it as sustainable on

the first ground set forth in *Story, supra,* that "the error did not prejudice the defendant or the prejudice was de minimis." We find the analysis of the courts in civil cases holding such evidence to be prejudicial as being equally prejudicial in criminal cases of this type.

Finally, the properly admitted and uncontradicted evidence of guilt is not so overwhelming even after discounting the victim's testimony as biased in favor of the defendant, his father.

Accordingly, we conclude that the Commonwealth has not shown, beyond a reasonable doubt that the error did not influence the jury. We further conclude that the erroneously admitted testimony was not harmless error.[2]

As a new trial is awarded, we will address the second issue. We conclude that the court did not err in refusing to admit the letter from Children & Youth Services noting that their agency did not make an indicated finding in this case.

The defendant argues the letter should have been presented to the jury so they could afford it whatever weight was deemed appropriate.

The court ruled that the unfounded finding of Children & Youth Services in investigating the alleged child abuse

---

2. *Counsel have not cited to us nor has our research developed any appellate court authority in Pennsylvania that the Cusatis* holding in civil cases applies to criminal cases. Recklessness is a state of mind in both civil and criminal cases. There is no logical reason to conclude that intoxication bears on a reckless state of mind in civil but not in criminal cases.

The principle of law that relevant evidence may be excluded on grounds of prejudice finds precedent in our criminal as well as civil cases. See Packet-Poulin, *Pennsylvania Evidence* §403.

allegation arising out of the instant conduct was not relevant because the basic standard applied by CYS in the investigation involved a different type of physical harm than the Crimes Codes §2701 dealing with simple assault.

The Crimes Code defines bodily injury, which is the gravamen of the simple assault charge in 18 Pa.C.S. §2301 as "impairment of physical condition or substantial pain." On the other hand, the Child Protective Services Law defines "child abuse" as "serious physical or mental injury which is not explained by the available medical history as being accidental...." Serious physical injury is defined in the pertinent regulation found at 55 Pa. Code §3490.4 as:

"An injury caused by the acts or omissions of a perpetrator which does one of the following:

"(i) Causes the child severe pain.

"(ii) Significantly impairs the child's physical functioning, either temporarily or permanently.

"(iii) Is accompanied by physical evidence of a continued pattern of separate, unexplained injuries to the child."

Defendant's counsel concedes that the definitions are different but notwithstanding this, the letter noting this as an unfounded report[3] should be admitted with an ex-

---

3. *The Child Protective Services Law provides the following definitions—23 Pa.C.S. §6303:*

"*Founded Report*—A report made pursuant to this chapter if there has been any judicial adjudication based on a finding that a child who is a subject of the report has been abused.

"*Unfounded Report*—Any report made pursuant to this chapter unless the report is a 'founded report' or unless an investigation by the appropriate child protective services determines that the report is an 'indicated report.'

planation by the court as to the different standard of physical harm involved in the Crimes Code as compared to the Child Protective Services Law. This, the trial court declined to do, and we find no error in this regard.

---

*"Indicated Report*—A report made pursuant to this chapter if an investigation by the child protective service determines that substantial evidence of the alleged abuse exists based on any of the following:

"(1) Available medical evidence.

"(2) The child protective service investigation.

"(3) An admission of the acts of abuse by the parent of the child or person responsible for the welfare of the child."