423 A.2d 702

FRANK B. BOZZO, INC., a Corporation

v.

ELECTRIC WELD DIVISION OF the FORT PITT BRIDGE DIVISION OF SPANG INDUSTRIES, INC., a Corporation, Appellant.

Superior Court of Pennsylvania.

Argued Nov. 13, 1979.

Filed April 25, 1980.

Reargument Denied Aug. 4, 1980.

Petition for Allowance of Appeal Denied Dec. 5, 1980.

38

James H. McConomy, Pittsburgh, for appellant.

Richard S. Dorfzaun, Pittsburgh, for appellee.

Before PRICE, HESTER and CAVANAUGH, JJ.

CAVANAUGH, Judge:

An action in assumpsit was commenced in the court below by Frank B. Bozzo, Inc. (appellee) for an alleged breach of the contract entered into between appellee and Electric Weld Division of the Fort Pitt Bridge Division of Spang Industries, Inc. (appellant) on or about March 14, 1973. Under the contract, appellant was to furnish approximately 120,000 square yards of steel mesh to the appellee for

delivery in 1973 through 1975. The steel mesh was to be used in concrete paving on a section of highway to be built in Elk County, Pennsylvania. Appellee alleged in its Complaint that the appellant failed to deliver all of the material ordered and as a consequence, it incurred increased labor, equipment, and material costs. The case was tried before Farino, J., and a jury in a trial lasting six days. The jury returned a verdict in favor of the plaintiff–appellee and against defendant–appellant in the amount of $150,640.10 plus 6% interest. Appellant's motions for new trial and for judgment non obstante veredicto were denied and it has appealed to this court.

In order to understand this complex case, the factual background must be explained in some detail. Appellant was for many years engaged in concrete paving work on highways in western Pennsylvania. The company was a small one having only eight to ten permanent employees and when required on a given job, it used union employees as operating engineers, carpenters, cement masons, teamsters, laborers, and pile drivers. The number of employees could range from about forty to one hundred twenty–five people depending on the paving contract involved. On some jobs, appellee worked as a general contractor and on others, as a subcontractor installing the concrete paving for the general contractor.

Early in 1973, the appellee learned that the Pennsylvania Department of Transportation (PennDOT) was going to bid for construction of a highway in St. Marys, Elk County. Appellee reviewed the plans and specifications which it received from PennDOT and its representatives visited the job site. Appellant furnished the appellee with a quotation of the prices of the steel mesh and steel accessories which would be required for the job. Appellee submitted its bid to PennDOT and was awarded the contract as the low bidder. Appellee then contacted appellant and the parties discussed appellant's furnishing the steel mesh and accessories to be

used on the job. On this job, the steel mesh was to be composed of longitudinal and transverse steel rods that are machine welded to form a sheet. The sheet or grid is placed in the concrete bed of the highway about 2½ inches below the finished surface to strengthen the road and make the concrete more durable.

The job on which appellee was the successful bidder involved constructing four miles of highway in Elk County and was to take three construction seasons to complete. Appellee intended to use what is known as a slip–form paving train in the construction of the highway. This is a machine which consists of several pieces of equipment used in road construction which permits the paving of a highway without the placing of forms for the laying of the concrete. Another type of machinery used in road construction is form–riding equipment which necessitates the use of side forms to hold up the concrete. The slip–form paving train and the form–riding equipment do basically the same job in road construction except side forms are not required in using the slip–form paving train which can also pave a wider road bed than can be done with the form–riding equipment.

In March, 1973 when appellant and appellee entered the contract in question, the appellee did not own a slip–form paving train but did acquire one later in 1973 after it was awarded the contract for the St. Marys' project. The new slip–form paving train which appellee purchased was considerably more expensive than the form–riding equipment that it already owned.

On or about March 14, 1973, appellant and appellee reduced to writing their agreement under which basically appellant was to furnish 120,000 square yards of steel mesh and related accessories to appellee. Unfortunately, the written contract is lacking in the quality of definiteness which is so important to a lawyer in preparing a contract but which is often overlooked by businessmen. The written agreement which underlies the dispute in this case states, inter alia:

"ELECTRIC WELD DIVISION
FORT PITT BRIDGE WORKS SUBSIDIARY
P. O. Box 151 Canoñsburg, Pa.

PROPOSAL CONTRACT Date: March 14, 1973

To: Frank B. Bozzo, Inc. Project: PennDOT Letting 3–2–73
 P. O. Box 128 Elk County
 Bridgeville, Pa. 15017 L. R. 99–A06
 St. Marys, Pa.

----

We propose to furnish subject to prompt acceptance and
conditions on both sides of this proposal sheet, the follow-
ing described material required for the above project:

FOR 1973 DELIVERY 9" R. C. C. Pavement

Approx. 50,000 S.Y. Type "F" _____at $0.8075/S.Y.
Approx. 9,800 L.F. Saw Joint _____at $1.20/L.F.
Approx. 4,500 Pcs. Hook Bolts or Dowels __at $0.45/EACH

FOR 1974–1975 DELIVERY

Approx. 70,053 S.Y. Type "F" _____at $0.83/S.Y.
Approx. 13,420 L.F. Saw Joint _____at $1.25/L.F.
Approx. 6,225 Pcs. Hook Bolts or Dowels __at $0.50/EACH

The above prices do not include the present 6% Pennsylvania
Sales Tax.

This proposal subject to approval by our Credit Department.
'This quotation may be withdrawn by us if not accepted
by you within thirty days from date.' "

The contract was signed by duly authorized representa-
tives of the appellant and by the appellee as the purchaser.

At the time the contract was entered into, there was a
discussion between the parties as to when the steel mesh
would be needed. Road construction started shortly after
the contract was entered into and during 1973 the appellant
made timely delivery to the appellee of all the steel mesh
and related accessories that it required. Since the written
contract was silent as to the dates of delivery and the
amounts of steel mesh to be delivered on any given date,

delivery terms were orally agreed to by the parties as was customary in the industry. All went well in 1973, and appellant delivered the 50,000 square yards of mesh ordered for 1973.

Appellant procured the steel mesh which it sold to the appellee from the United States Steel Corporation. Appellant was advised in 1973 by United States Steel that the supply of steel mesh would be critical in 1974 and it was advised that United States Steel's customers would be put on an allocation for the first three–quarters of 1974. Although the appellant contended that it contacted appellee (as well as other customers) and advised it of the expected shortage of steel mesh which it was to obtain from United States Steel, appellee denied learning of the shortage until August, 1974.

Construction on the St. Marys project ceased in the fall of 1973 when the weather became too cold to continue with the paving and appellee planned to resume paving on the St. Marys job in May, 1974 or as soon as the weather was satisfactory. Appellee planned on using the slip–form paving train on the St. Marys job in May and June of 1974 and then transfer the train to another job site and return it to the St. Marys project in August, 1974 to complete the project. Appellee requested that appellant deliver the balance of the steel mesh to the St. Marys project in June, 1974 and advise the appellant that it would take delivery any time that the steel mesh was available. Beginning in March, 1974, the appellee constantly reminded the appellant of its need of the balance of the steel mesh to complete the St. Marys project. By July, 1974, the material was still not delivered to the project and in August, 1974, appellee advised appellant that its job in Donora, Pennsylvania was completed and that it was returning the paving train to Elk County. Appellee had to complete the Elk County project in August, 1974 if it was going to use the paving train as it needed the train in Pittsburgh in September, 1974 to do work at the Greater Pittsburgh Airport on a paving job.

In August, 1974, appellant advised appellee for the first time that it could not deliver the steel mesh to the St. Marys project in August as appellant was not then able to obtain the steel mesh from United States Steel. Since the steel mesh needed by the paving train was not on hand at the St. Marys project, appellee had to move its form–riding equipment to the St. Marys job and this equipment only constructs a single lane of highway. Appellee had not intended to use form–riding equipment for the St. Marys project when the contract was entered, although it is not clear that was communicated to appellant.

On August 12, 1974, counsel for appellee wrote to appellant and stated that appellant had breached the contract of March 14, 1973 to furnish the steel mesh and related materials and that the appellee would "exercise all available legal recourse to protect itself from this breach of contract and the substantial losses which will occur by reason thereof." The letter also stated that: "Certainly, it is clear that the losses, in totality, will be well into the hundreds of thousands of dollars."

Since the mesh was not delivered to St. Marys in August, 1974, appellant could not use its slip–form train on the St. Marys job. Appellee had only one slip–form train and it was needed, as stated above in September, 1974 for use at the Greater Pittsburgh Airport project, a repaving job that appellee obtained in July, 1974. Although the appellant was able to deliver the wire mesh in September, 1974, the slip–form train was no longer at St. Marys and appellee had to use its older and less efficient form–riding equipment to complete the job. Also, appellant supplied a different type of steel mesh for part of the job than was originally ordered.

Appellant raises four issues on appeal. First, it contends that the trial court erred in failing to submit to the jury the issue of impracticability of performance. In support of this contention, appellant relies on § 2–615 of The Uniform Commercial Code [1] which provides:

§ 2–615. Excuse by Failure of Presupposed Conditions:

1. Act of April 6, 1953, P.L. 3, 12A P.S. § 2–615.

Except so far as a seller may have assumed a greater obligation and subject to the preceding section on substituted performance:

(a) Delay in delivery or non–delivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the non–occurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid.

(b) Where the causes mentioned in paragraph (a) affect only a part of the seller's capacity to perform, he must allocate production and deliveries among his customers but may at his option include regular customers not then under contract as well as his own requirements for further manufacture. He may so allocate in any manner which is fair and reasonable.

(c) The seller must notify the buyer seasonably that there will be delay or non–delivery and, when allocation is required under paragraph (b), of the estimated quota thus made available for the buyer.

■ Appellant contends that the failure or delay by a particular source of supply that was in the parties' contemplation at the time of contracting will excuse a seller because it is a basic assumption of the contract. (Appellant's brief, page 16.) However, the evidence did not establish that when the contract was made on March 14, 1973, that the parties intended that the steel mesh ordered would be manufactured only by United States Steel Corporation. It was immaterial to appellee at the time the contract was made where the appellant obtained the steel mesh. The contract between the parties did not require United States Steel to manufacture the steel mesh and other companies, as Bethlehem Steel Corporation, manufactured the same product.

Of greater importance is the fact that according to appellant it could have provided the steel mesh during the first three months of 1974 if appellee had been willing to take it then, but it refused to do so because "in January, February, and March there is liable to be a foot of snow in St. Marys." (N.T. 230.) Appellant knew it had an obligation under its contract with appellee to provide the steel mesh in 1974 and since it had it available in the early part of 1974, it could have set the mesh aside to make it available to appellee when it was called upon to deliver it. If appellant did not want to stockpile the steel mesh and was convinced that United States Steel could not provide the mesh at a later date, it could have arranged to obtain the mesh from a source other than United States Steel.

Basically, appellant's defense is that United States Steel Corporation was to be the sole source of supply for the steel mesh ordered by appellee and that in August, 1974 when appellant needed the mesh at St. Marys, that United States Steel could not furnish the mesh. The court below properly refused to submit the issue of commercial impracticability under § 2–615 of The Uniform Commercial Code to the jury as appellant could have provided the delivery of the steel mesh to appellee in the summer of 1974 as it had it available in early 1974.[2]

■ Points for charge are designed to put before the jury various instructions to help them resolve the issues before them. It is basic that instructions given to a jury must be confined to the issues raised in the pleadings and the facts developed by the evidence. *Heymann v. Electric Service Manufacturing Company*, 412 Pa. 338, 345, 194 A.2d 429, 432

---

**2.** The appellant's requested points for charge on commercial impracticability were:

9. When the parties to a contract agree or assume that a source of material will continue to be available to them and that source becomes unavailable or no longer produces the expected materials, the performance of the plaintiff is said to be impracticable and will not give rise to damages.

10. If you find that United States Steel Corporation was assumed by the parties to be the source of materials and that U.S. Steel did not provide those materials, you must find for the defendant.

(1963). We believe that the court below properly refused to charge the jury on the issue of commercial impracticability.

Although appellant relies on *Campbell v. Hostetter Farms, Inc.*, 251 Pa.Super. 232, 380 A.2d 463 (1977) to sustain its contention that the court erred in not submitting the question of commercial impracticability to the jury, its reliance is misplaced. In the *Campbell* case, the parties contracted for the sale of wheat and corn. The court found that although the written contract referred to specific bushels of wheat and corn that "[i]f the contract was intended to apply to the estimated yield of appellee's farms, his partial failure of delivery was excusable under § 2–615 of the Code if the jury found that the shortfall in deliveries resulted from unseasonably wet weather contrary to the basic assumption on which the contracts were made." 251 Pa.Super. at 240, 380 A.2d at 467. In the instant case, the buyer, appellee, did not assume that United States Steel Corporation was to be the only source of supply of the mesh. Further, as stated above, the mesh could have been delivered by appellant in accordance with the terms of the contract.

As part of its argument that the court erred in refusing to instruct the jury on the defense of commercial impracticability, appellant also argues on appeal that the "[f]act issue of whether Electric Weld employed a reasonable method of allocating paving mesh to its customers should have gone to the jury." Appellant's brief, page 23. Since we have decided that the issue of commercial impracticability was properly not submitted to the jury, it was also proper not to submit the question of allocation.

■ Appellant's second contention is that the court below erred in refusing to instruct the jury that appellant was not responsible for a delay in delivery caused by conditions beyond its control.[3] We find no error in refusing to so charge as the evidence established that appellant could have

3. Appellant's point for charge on conditions beyond its control was:
 3. If you find that the shipment or delivery of mesh by United States Steel Corporation was beyond the control of defendant, then you must find for the defendant.

made delivery in accordance with the contract since it had the necessary steel mesh on hand in the early part of 1974 and could have stockpiled it had it so desired. Appellant argues that "Electric Weld had no control over the production of mesh by U.S. Steel Corporation." (Appellant's brief, page 28.) This statement is undoubtedly accurate but it misses the point. Appellant had an obligation under its contract with appellee to deliver an additional 70,000 square yards of steel mesh, it having already properly delivered 50,000 square yards of steel mesh in 1973. It had the mesh available in early 1974 and would have apparently delivered it at that time if appellee could then have used the mesh, as it could not, since the winter weather prohibited road construction.

■ Appellant also argues that "Electric Weld assumed no greater obligation than to seek delivery by United States Steel." (Appellant's brief, page 28.) This argument is diametrically opposed to the contract between the parties. Appellant did not agree with the appellee that it would try and have United States Steel Corporation supply mesh to Frank B. Bozzo, Inc. Appellant agreed that it would supply the steel mesh of a specific type, and a substantial amount of it, to the appellee when the appellee required it in connection with the road construction. At this juncture it is inappropriate to attempt to modify its contractual obligations to a mere seeking of "delivery by U. S. Steel."

■ The written agreement between the parties provided "no claims for delay resulting from labor troubles, car shortages, fires, accidents, or other causes unforeseen or beyond seller's reasonable control will be allowed." If a foreseeable contingency is covered in a contract to excuse non–performance, it will be given effect. *See Luria Engineering Co. v. Aetna Casualty and Surety Company*, 206 Pa.Super. 333, 338, 213 A.2d 151, 154 (1965). However, the only parts of the exculpatory clause that could arguably apply in the instant case was the part dealing with delay resulting from causes unforeseen or beyond the seller's reasonable control. Appellant was aware that United States

Steel Corporation might have difficulty in supplying it with the steel mesh during 1974. In the first quarter of 1974, the steel mesh was available and the delay in the delivery of the steel mesh to appellee in the summer of 1974 was not unforeseeable to the appellant and was not due to circumstances beyond its control.

Appellant's third contention is that the court below erred in refusing to grant a new trial based on alleged incontrovertible perjury by Joseph F. Bozzo, appellee's president and principal stockholder. Mr. Bozzo testified that in August, 1974, the appellee had about three miles of highway ready to pave and that it could not use the slip–form train because the appellant had not delivered the steel mesh and accessories. Appellant alleges that PennDOT records which it discovered after trial proved that the appellee had not prepared a sufficient sub–base by mid August to allow it to complete the paving and that even if appellant had delivered the steel mesh by that time, appellee was not ready to use it. Appellant did not give any reason why the PennDOT records were not available at trial, if such was the case. After discovered evidence is not grounds for a new trial unless it is established that the evidence could not have been obtained at trial by reasonable diligence. *Freed v. Priore*, 247 Pa.Super. 418, 424, 372 A.2d 895, 899 (1977). Appellant has cited no legal authority at all to sustain its contention that in this case a new trial should be granted because of alleged incontrovertible perjury.

Finally, appellant contends that the court below erred in failing to instruct the jury that damages to be recoverable must have been reasonably foreseeable at the time the contract was made.[4] In reviewing the charge to the jury, an

---

4. The appellant's requested points for charge on the issue of damages was as follows:
 6. In order for damages to be recoverable, they must be such as were reasonably foreseeable by the parties at the time the parties entered into their original contract in March, 1973.
 To the extent that plaintiff's damages resulted from his own conduct and not from that of defendant, those damages are not recoverable from the defendant.

appellate court must look at the charge in its entirety against the background of evidence to determine whether or not error was committed. *Leopold v. Davis*, 246 Pa.Super. 176, 179, 369 A.2d 868, 870 (1977).

The court's charge with reference to breach of contract and damages resulting from breach of contract was as follows:

> However, if you find that there was a breach of the original contract by the Defendant in not delivering the wire mesh to the plaintiff in June and August of 1974, and that said breach was not waived by a subsequent agreement in August of 1974, then you will find for the plaintiff. You will then further determine what reasonably foreseeable damages the plaintiff sustained as a result of the Defendant's breach of contract and award that amount together with interest from the date that the damages accrued.

The Uniform Commercial Code provides in § 2–715(2)(a): "(2) Consequential damages resulting from the seller's breach include (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise." From the time of *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng.Rep. 145 (1854) the law has required that consequential damages to be recoverable must have been reasonably foreseeable at the time the contract was made. In an assumpsit action, once the breach of contract by the defendant has been established, it is necessary to determine what damages, if any, had been suffered by the plaintiff. The jury was left without proper guidance in the court's direction that "[y]ou will then further determine what reasonably foreseeable damages the plaintiff sustained as a result of the defendant's breach of contract and award that amount together with interest from the date the damages accrued." The jury did not know at what time the damages were to be reasonably foreseeable. They were not instructed whether the damages were such that would have been foreseeable when

the contract was made or at the time that it was breached or even at some other point during this complicated transaction. The charge to the jury was incorrect on a matter that went to the very heart of the issue of damages.

 Under The Uniform Commercial Code, § 2–715, for consequential damages to be recovered the damages must result from the buyer's requirements which the seller had reason to know at the time the contract was made. *Kelly v. Hanscom Brothers, Inc.,* 231 Pa.Super. 357, 363, 331 A.2d 737, 739–40 (1974). It is necessary in order to charge the defendant with a particular loss that the loss be one that ordinarily follows the breach of such a contract in the usual course of events or is one that reasonable men in the position of the parties would have foreseen as a probable result of the breach. *R. I. Lampus Co. v. Neville Cement Products Corporation,* 474 Pa. 199, 203, 378 A.2d 288, 291 (1977).

As pointed out by Professors White and Summers, Uniform Commercial Code, at Pg. 317:

. . . [U]nder the Code [§ 2–715] the seller is liable for consequential damages when he had reason to know of the buyer's general or specific requirements at the time of contracting regardless of whether he consciously assumed the risk of such loss.

. . . [§] 2–715(2) codifies the more liberal reading of *Hadley v. Baxendale.* Most of the courts have recognized that a seller is liable for all damages resulting from his breach if they arise from circumstances that the seller knew about or had reason to know about, even if he did not consciously assume the risk of such liability. The plaintiff can recover lost profits if the seller had reason to know at the time of contracting that if he breached the contract, the plaintiff would be deprived of those profits. (Page 324).

Because of the brevity and significance of 2–715, it is important to remember that it draws on over a century of common law development, which began with *Hadley v.*

*Baxendale.* The better–reasoned authority emerging from that background and the intent of the draftsmen declare that *the basic test for the recovery of consequential damages is whether the losses were foreseeable (not foreseen) by the seller at the time he entered the contract.* (Emphasis added, page 325)

The court below stated in its opinion "the damages listed by the plaintiff were all foreseeable at the time of the contract execution, and there was no need to include this in the charge and at most constituted harmless error." We find that the court erred in not charging that damages must have been foreseeable at the time the parties entered the contract. Appellant's sixth point for charge set forth the requirement that the damages be such as were reasonably foreseeable at the time the contract was made in March, 1973. With respect to the appellant's sixth point for charge, the court stated: "5, 6, and 7 are granted, again insofar as I feel that that's covered in my charge;" (N.T. 421). The court also granted the appellant an exception as to all points for charge that were denied. Although the court stated that it granted appellant's sixth point for charge, it in effect denied it. The appellant was misled by the court's statement that it granted the appellant's requested point for charge on damages and then omitted an essential part of the point for charge. The court below found that the appellant waived any defect in the charge as it did not specifically except to the portion of the charge dealing with damages after the charge was given. The lower court relied on *Dilliplaine v. Lehigh Valley Trust Co.,* 457 Pa. 255, 322 A.2d 114 (1979) which held that basic and fundamental error would no longer be recognized as a ground for consideration on appeal unless a specific exception was taken to allegedly erroneous jury instructions. In the *Dilliplaine* case, supra, the plaintiff did not offer a point for charge on the issue which was raised on appeal as the basis for a new trial. We find that the issue of foreseeability of damages at the time that the contract was entered has been preserved for appeal. In the instant case, the appellant not only brought the issue

of foreseeability of damages to the trial court's attention in its point for charge which was in effect denied, although the court stated that it would grant it, counsel for the appellant after the charge was given referred to the exception that it had previously taken to the earlier denial of his points for charge. Appellant also raised the issue of foreseeability of damages in its motion for new trial which was argued before the court below. As the court stated in *Dilliplaine, supra,* "requiring a timely specific objection to be taken in the trial court will ensure that the trial judge has a chance to correct alleged trial errors. This opportunity to correct alleged errors at the trial advances the orderly and efficient use of our judicial resources. First, appellate courts will not be required to expend time and energy reviewing points on which no trial ruling has been made. . . . *Dilliplaine v. Lehigh Valley Trust Company, supra,* 457 Pa. at 258, 322 A.2d at 116. *See also Behrend v. Bell Telephone Company,* 242 Pa.Super. 47, 363 A.2d 1152 (1976).

We find that the evidence was sufficient to sustain the verdict with respect to the breach of contract by appellant, but remand the case to the court below for a new trial on the issue of damages only.

Order reversed as to denial of appellant's motion for new trial and new trial granted on issue of damages only.

HESTER, J., files a concurring and dissenting statement.

HESTER, Judge, concurring and dissenting:

I concur with the Opinion of the majority to the effect that the evidence produced at trial was sufficient to sustain the verdict with respect to the breach of contract by appellant.

I respectfully dissent to that portion of the majority Opinion which would award a new trial to appellant restricted to the issue of damages. I would affirm on the Opinion of Judge Farino of the court below.