J-A24025-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| MYRNA COHEN | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| JS ASSOCIATED SERVICE, T/D/B/A SERVICEMASTER OF GREATER PITTSBURGH | |
| Appellee | No. 390 WDA 2017 |

Appeal from the Judgment Entered April 17, 2017
In the Court of Common Pleas of Westmoreland County
Civil Division at No(s): 4775 of 2009

BEFORE: MOULTON, J., SOLANO, J., and MUSMANNO, J.

MEMORANDUM BY SOLANO, J.:                    **FILED DECEMBER 15, 2017**

Appellant Myrna Cohen appeals from the judgment following a bench trial in her action for breach of contract against Appellee JS Associated Service, trading and doing business as ServiceMaster of Greater Pittsburgh ("ServiceMaster"). Cohen prevailed in the action, but was awarded only $154.[1] Her appeal contends that she was entitled to recover additional damages. We affirm.

In late February 2007, Cohen discovered a water leak in the first-floor bathroom of her home. N.T. Trial, 9/14/16, at 31, R.R. at 148a.[2] A

---

[1] The judgment also denied ServiceMaster's claim for fees associated with Cohen's alleged delay of trial, but ServiceMaster has not appealed that aspect of the decision.

[2] The certified record transmitted to this Court did not include the complete trial transcript, but additional portions of the transcript were included in the
*(Footnote Continued Next Page)*

repairman, Scott Steel, discovered that the leak resulted from a failed trap in the sink and repaired the trap. Steel N.T., 9/14/16, at 4–6, R.R. at 269a–71a. Steel pointed out that some mold had resulted from the leak, and Cohen therefore notified her homeowner's insurer, Travelers Insurance Company, and made a claim. N.T. at 31–32, R.R. at 148a. On April 3, 2007, ServiceMaster, which had been recommended by Travelers, presented Cohen with two estimates for the mold remediation work and for "pulling up the floor and baseboards," "putting the plywood back in the bathroom," and "moving around the appliances and content." Pl.'s Ex. 3. In a cover e-mail, ServiceMaster's project manager, Johnny Samek, stated: "We will not be doing the repairs beyond the remediation because it is a far distance from our office. We will leave the site when the remediation is done ready for you[r] contractor to start the rebuild." *Id.*

After obtaining Travelers' approval, Cohen hired ServiceMaster for the job. N.T. Trial at 32, R.R. at 148a. Both parties agree that ServiceMaster's revised combined estimate — Pl.'s Ex. 2a (hereinafter, "the Agreement") — became the governing contract in this case. *See* Cohen's Brief, 6/29/17, at

_(Footnote Continued)_ ————————

reproduced record. Because no party has challenged the accuracy of the transcript in the reproduced record, we rely on it here. *See* Pa.R.A.P. 1921 (noting, "where the accuracy of a pertinent document is undisputed, the Court could consider that document if it was in the Reproduced Record, even though it was not in the record that had been transmitted to the Court" (citing *Commonwealth v. Brown*, 52 A.3d 1139, 1145 n.4 (Pa. 2012)).

19; ServiceMaster's Brief, 7/31/17, at 13.[3]  The Agreement stated:

> This estimate does not include any repairs at this time with the exception of installing new subfloor in the bathroom so that there will not be a hole there.  The repairs are going to be done by someone other than ServiceMaster and the repair estimate should be done after the remediation due to the possibility of more or less building materials needing to be removed.

Agreement at 1 (unpaginated).  The Agreement explained that a different contractor was to install permanent **flooring**, in contrast to subflooring, sometime after ServiceMaster finished its work —

> The [future] contractor can put other layers in and final floor covering later.  The goal is not to bring the floor completely level[;] it is to cover the plank flooring and cracks which would be letting air in from the basement and possibly cause air testing to fail and make the floor safe to walk on.

Agreement at 3.

Cohen left her house during the remediation work because she was told it would be unsafe for her to be there while ServiceMaster removed mold.  N.T. Trial at 32–34, R.R. at 148a–49a.  ServiceMaster used glue and screws to install the subflooring.  N.T. Trial at 7, 55, R.R. at 142a, 154a.  When Cohen returned, she was unhappy with what she found:

> Q. When you returned to the house following the work, what did you discover?
>
> A. Look at the alcoved area, not by the powder room, across.  That floor, the waferboard floor that was left, that ServiceMaster

---

[3] The agreement was attached as an exhibit to Cohen's original and amended complaint, and it is reproduced multiple times in the reproduced record.  **See, e.g.**, Pl.'s Ex. 2a, R.R. at 159a-66a, R.R. at 167a-74a.  The record contains two similar documents marked as Exhibits 2 and 2a.  The parties do not dispute that the governing contract is Exhibit 2a.

installed, wasn't even. It was off by a decent distance that somebody could trip over it; I could trip over it, 'cause I did. Then, there -- where the wood left off, different parts of the room, there was spaces. So you could see what I call, I don't know, ceiling, floor, what I call the original floor, you could see spaces between the waferboard floor and the wall, and you could see the -- what I call the original floor. There were also areas that you could see from. If you look down, you're looking from the kitchen area to the ceiling, there was nothing. So -- oh, and where the powder room is, there was a piece of wood extending the -- this (indicating) part, the corner, the outside corner of the powder room, there was a piece of wood extending, and then between the kitchen and what would be a small hall there was a space. That was it, pretty much it.

Q. What was your reaction to what you saw?

A. I thought that there was something that was really off.

N.T. Trial at 35–36, R.R. at 149a.

Cohen called Steel for assistance, but he told her to "call the people who did this job because this isn't my work." N.T. Trial at 37, R.R at 150a. Cohen claims that she then made several efforts to obtain relief from ServiceMaster, but was unsuccessful. N.T. Trial at 38–45, R.R. at 150a–52a. Cohen therefore obtained estimates from other contractors for the cost to complete the remaining repair work in her home. The estimates included work to repair other damages resulting from the water leak. Trial Ct. Op., 2/3/17, at 3, 4. Among those providing estimates was Steel, who estimated a cost of $6,038. He submitted that estimate with an intention that Cohen would send it to Travelers for possible reimbursement. Steel N.T. at 23, R.R. at 288a; Pl.'s Ex. 10.

On August 7, 2009, Cohen sued ServiceMaster for breach of contract, contending that it had performed "improper and unworkmanlike installation of the subflooring." Compl., 8/7/09, at ¶ 22. Cohen alleged that ServiceMaster had told her that "the subflooring was only temporary," but that other contractors informed her that "the subflooring installed by ServiceMaster would have to be removed and replaced with new subflooring," due to its permanent installation. *Id.* at ¶¶ 19-20.

The trial court issued an order on April 28, 2010 dismissing "all claims which relate to an Agreement to install or repair joints." *See* Order, 4/28/10, at 1. On November 19, 2015, Cohen filed an amended complaint that added a damages claim for Cohen's out-of-pocket expenses for repairs, future out-of-pocket expenses for repairs, costs for repairs to correct ServiceMaster's work, and loss of use of Cohen's dwelling. Am. Compl. at ¶ 26.

A non-jury trial was held on September 14, 2016. During the trial, Cohen presented testimony from Steel that the estimated total cost to repair the floor would be $11,556. Steel N.T. at 3, R.R. at 225a. On cross-examination, ServiceMaster confronted Steel with his 2007 estimate of $6,038. Steel testified that only lines seven through ten on his 2007 estimate would be needed to fix the subfloor installed by ServiceMaster; the items on those lines totaled $154. Steel N.T. at 44–46, R.R. at 309a–11a;

Pl.'s Ex. 10.[4]  All other amounts on the estimate were for work to finish the project — the work that ServiceMaster said would be done by a separate contractor.  Steel N.T. at 43-44, R.R. 308a–09a.  Steel further explained that the $11,556 estimate he provided at trial included work to level the subfloor.  He admitted, however, that "put[ting] the extra money in to do it, to get everything level" was not necessary.  Steel N.T. at 45, R.R. at 310a. Steel also conceded that the higher in-court estimate of $11,556 incorporated work likely not covered by the insurance company.  Steel N.T. at 23–25, R.R. at 288a–90a.

Cohen also presented evidence from a second contractor, Ernest Eddington, that the cost would be between $20,000 to $25,000.  N.T. Trial at 11–13, R.R. at 143a–44a.  Eddington's estimate did not provide any line-by-line breakdown to support this amount.  *See* Trial Ct. Op. at 4.

On November 2, 2016, the trial court found in Cohen's favor on her contract claim and awarded her $154 in damages.  Order, 11/2/2016.  The court explained:

> This Court reviewed the testimony and compared the two estimates prepared by Mr. Steel for the repair of Plaintiff's kitchen and powder room. In regards to the first estimate, which

---

[4] These lines were:

| Line 7. | Pull up subfloor piece, shim, replace | $23.00 |
| Line 8. | Screw down subfloor | $86.00 |
| Line 9. | Install subfloor pieces | $20.00 |
| Line 10. | Install leveler to cracks | $25.00 |

Pl.'s Ex. 10.

was entered as Exhibit Number 10, Mr. Steel clearly agreed on cross-examination that if he completed line items seven through ten, then he would be able to start the rebuild process from there and put the kitchen back together. Defendant's counsel specifically posed to him: "Seven, eight, nine, and ten are work that you'd have to perform to the subfloor ServiceMaster put down. Is there anything else besides seven, eight, nine, ten?" Mr. Steel's response was: "That would be it."

Plaintiff further argues that subsequent contractors could not come in and finish the kitchen due to the condition of the subfloor. However, when Mr. Steel was justifying the second, higher estimate, he indicated that the kitchen could in fact be completed with the condition of the subfloor if line items seven through ten were completed. He stated that: "You can do it [. . .], I've gone into houses and I've done that before for people because they don't want to put the extra money in to do it, to get everything level." Therefore, it is clear from the testimony presented that Defendant's workmanship on the subfloor did not impede completion of the kitchen and powder room except for the need to complete line items seven through ten.

In regards to the second estimate, it was clear from the testimony of Mr. Steel that the increase to the $11,556 figure was based on work required to level the subfloor. He testified that not only was he going to remove the base floor installed by Defendant, but he was going to "tear the flooring that's underneath it [. . .], I was going to [. . .] install jacks in the basement, [. . .] and take out the main support beam that's in there right now, set that onto jacks, slowly jack up, as close to level as I can, and then from there repair or shim, or whatever I need to do with the existing floor joists in that kitchen to get it as close to level as I can, and then from that point I'm going to go ahead, and the bid would encompass completely finishing." Mr. Steel specifically indicated that with his original bid, he was doing what the insurance company would cover, which did not include "repairing the unevenness of the floor, [. . .], either jacking, leveling, or fixing supports in the basement [. . .], and that's why [the estimate] would be considerably more today [. . .]."

Based on Mr. Steel's explanation regarding the second estimate, this Court can only conclude that Defendant is not responsible for the additional fees relating to the work contemplated by the second estimate. . . . Therefore, Defendants cannot be made to

pay the $11,556 estimate when Plaintiff's own witness indicated that the additional work justifying said cost related to claims that this Court already dismissed.

Plaintiff also relied on the additional testimony of Mr. Eddington, which estimated the costs of repair to be [$20,000 to $25,000]. However, there was no basis established for this figure and there was no way for this Court to determine the specifics of said estimate. The only evidence presented that demonstrated any cost associated with repairing work done by Defendants were the line items previously relied on by this Court, which amounted to the awarded figure of $154.

Trial Ct. Op. at 2-4 (unpaginated) (citations to record omitted).

Cohen filed a Motion for Post-Trial Relief on November 17, 2016, seeking increased damages.[5] On February 3, 2017, the trial court denied that motion. Cohen then filed this timely appeal in which Cohen presents the following issues for our review:

1. Did the [trial] court err in its construction and interpretation of the parties' contract?

2. Did the [trial] court abuse its discretion in failing to consider the entirety of the testimony of Scott Steel, one of Cohen's expert witnesses on damages?

3. Was the [trial] court's nominal damages order in favor of Cohen inadequate and should it be set aside?

4. Did the [trial] court err in failing to award Cohen damages for loss of use of her dwelling?

Cohen's Brief at 6.

_____

[5] Cohen claims that she sought judgment notwithstanding the verdict ("JNOV"). Cohen's Brief at 3 ("Cohen's post-trial motion sought [JNOV] as to damages"). In fact, her motion requested that the court "modify and change the [Nov. 2, 2016 Order] to award damages to plaintiff in the minimum amount of $11,556.00." Cohen's Mot., 11/17/16, at 7–8.

## Contract Interpretation

According to Cohen, the intent of the contract "was for ServiceMaster to perform remediation and repair work in such a workmanlike manner so to allow another contractor to perform finishing work on both the kitchen and powder rooms." Cohen's Brief at 19. Cohen contends that ServiceMaster breached the contract by installing permanent subflooring (with screws and glue), and not temporary subflooring. *Id.* Due to the permanent nature of the flooring, subsequent contractors refused to work until ServiceMaster fixed that flooring. *Id.* at 19-20. As a result, according to Cohen, the cost of the finishing work was higher than it should have been. Cohen contends that the trial court erred in failing to construe the contract in a way that would award her additional damages for this breach.

According to ServiceMaster, the Agreement contemplated that a "future contractor may determine that more materials may need to be removed in the future as part of their rebuild." ServiceMaster's Brief at 13. This meant that contractors would have the option of removing the subflooring or retaining it as they continued with the rebuilding process. *Id.* at 14. ServiceMaster contends that its use of glue and screws on the subflooring is irrelevant and asserts that glue and screws would have been used even if "they knew 100% they would later be removed." *Id.* at 15-16.

The trial court held —

that the contract between Defendant ServiceMaster and Plaintiff was for mold remediation services and that those services were performed in accordance with the contract, that the estimate

provided to Plaintiff only required the installing of a new subfloor in the bathroom "so that there will not be a hole there," that the estimate provided clearly contemplated that the subfloor may not be sufficient and that additional repairs would be needed as the estimate itself included language stating that "repairs are going to be done by someone other than ServiceMaster and the repair estimate should be done after the remediation due to the possibility of more or less building materials needing to be removed," that Defendant ServiceMaster did conduct all work requested by Plaintiff in October 2007 in an attempt to satisfy Plaintiff[.]

Order, 11/2/2016, at 1-2.

We have explained:

The fundamental rule in contract interpretation is to ascertain the intent of the contracting parties. In cases of a written contract, the intent of the parties is the writing itself. When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself. When, however, an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances.

***Nicholas v. Hofmann***, 158 A.3d 675, 693 (Pa. Super. 2017) (citation and ellipses omitted). Upon reviewing the parties' Agreement in light of this standard, we conclude that the trial court interpreted the contract correctly.

The contract called for the installation of a "new subfloor in the bathroom so that there will not be a hole there." Agreement at 1. No party disputes that a new subfloor was installed. Nothing in the Agreement specified whether the subfloor was to be temporary or permanent or whether it could be installed with glue and screws; the Agreement made

- 10 -

clear that another contractor would install additional layers and the final flooring.

Because the contract did not specify how the subfloor was to be installed, we discern no basis to award Cohen relief on this issue. The trial court's decision was consistent with the parties' obligations under the Agreement, and we discern no error by the trial court in the way it applied the contract. Accordingly, Cohen's first issue is meritless.

**Inadequate Damages**

We consider Cohen's second and third issues together. Cohen asserts that the amount of damages awarded to her "was inadequate" and that it should "be set aside." Cohen's Brief at 28. She claims that the trial court improperly assessed the evidence in calculating the damages, and, in particular, that the court failed to properly consider Steel's testimony when calculating its award.

We have previously established the standard of review for considering the adequacy of a damage award:

> The duty of assessing damages is within the province of the fact-finder and should not be interfered with unless it clearly appears that the amount awarded resulted from partiality, caprice, prejudice, corruption or some other improper influence. Generally, a verdict will not be disturbed merely on account of the smallness of the damages awarded or because the reviewing court would have awarded more. To support the granting of a new trial for inadequacy, the injustice of the verdict should stand forth like a beacon. So long as the verdict bears a reasonable resemblance to the damages proved, it is not the function of the court to substitute its judgment for that of the [fact-finder].

- 11 -

*Epstein v. Saul Ewing, LLP*, 7 A.3d 303, 315 (Pa. Super. 2010) (citation omitted), *appeal denied*, 20 A.3d 1212 (Pa. 2011); *accord Davis v. Mullen*, 773 A.2d 764, 766 (Pa. 2001).

Cohen contends that her award "does not reflect the cost of remedying ServiceMaster's defective workmanship, and bears no reasonable relation to the loss suffered by Cohen." Cohen's Brief at 28. She contends that the trial court erred in failing to consider the "entirety" of Steel's testimony on damages,[6] *id.* at 6, 21, and argues that Steel's trial estimation of $11,556 should be read as "the **minimum** amount of damages that should be awarded." *Id.* at 28 (emphasis in original). Finally, Cohen asserts that Eddington's lump-sum estimation of $20,000–$25,000 "is a legally sufficient bas[i]s to award damages." *Id.*[7] Cohen cites *Burly Const. Corp. v. Com.*

---

[6] Cohen calls Steel an "expert witness." Cohen's Brief at 21. ServiceMaster does not dispute that Mr. Steel is an expert, and in fact, ServiceMaster relies on Steel's testimony in support of its argument. *See* ServiceMaster's Brief at 17–20.

[7] Cohen cites *Anderson v. Nye*, 11 Pa. D. & C.3d 734 (C.C.P. Northumberland 1979), to assert that an acceptable estimation is "a statement of who made the estimate, when it was made, what materials are to be used, and the cost of the labor to perform the work." Cohen's Brief at 28. As a Court of Common Pleas decision, *Anderson* is not binding on this Court. *See Newell v. Montana West, Inc.*, 154 A.3d 819, 823 (Pa. Super. 2017). Also, *Anderson* is inapt, as it was an order sustaining preliminary objections due to the plaintiff's failure to identify breach-of-contract damages in the complaint, and it did not address inadequate damages after a trial. 11 Pa. D. & C.3d at 739.

*Dep't of Justice*, 284 A.2d 841 (Pa. Cmwlth. 1971),[8] to support her assertion that a court may legally base its award of damages on a lump-sum estimate presented by a competent witness. Cohen's Brief at 28.

ServiceMaster argues that Cohen's estimations given at trial included costs for work beyond the scope of ServiceMaster's contractual duties. ServiceMaster's Brief at 20–21. ServiceMaster claims that the $154 award was appropriately based on Steel's estimate to complete lines seven to ten in his 2007 estimate, *id.* at 20, and urges us to disregard the estimate given by Eddington because it lacks any accuracy or reliability.

The trial court found that the estimates presented by both Steel and Eddington included expenses not contemplated in the Agreement, as well as expenses for which the trial court had already denied relief. Trial Ct. Op. at 3–4. Accordingly, the trial court found no basis for it to require ServiceMaster to pay the full $11,556 estimated by Steel. *Id.* The trial court considered Eddington's estimate of $20,000 to $25,000 to be baseless, and it instead relied on lines seven to ten of Steel's 2007 estimate because it reflected a verifiable cost of the work reflected in the Agreement — installation of subflooring in the bathroom. *Id.* The court held that Steel's testimony clearly proved that ServiceMaster would need to complete only lines seven through ten of his 2007 estimate in order for Cohen to begin rebuilding. *Id.* at 2. The trial court therefore found that, "except for the

---

[8] We are not bound by the decisions of the Commonwealth Court, although we may find them persuasive. *See Newell*, 154 A.3d at 823.

need to complete line items seven through ten," ServiceMaster's work did not prevent Cohen from hiring contractors to complete the rest of the repairs. *Id.* at 2–3.

Pennsylvania courts have long-recognized that "incomplete or defective performance of a building contract [should be] measured by the cost of completing the work or correcting the defects by another contractor." **Douglass v. Licciardi Const. Co., Inc.**, 562 A.2d 913, 915–16 (Pa. Super. 1989). Such a rule will apply unless —

> [t]he cost of completing performance or of remedying the defects is clearly disproportionate to the probable loss in value to the injured party[, in which case] damages will be measured by the difference between the market price that the property would have had without the defects and the market price of the property with the defects.

*Id.* at 916.[9]

In determining this measure, the trial court had discretion to consider the testimony of experts and assess their credibility. *See Christian v.*

_____

[9] Cohen cites to **Gadbois v. Leb-Co Builders, Inc.**, 458 A.2d 555, 558 (Pa. Super. 1983), to support her assertion that damages should be measured by the "reasonable costs to remedy the defects." Cohen's Brief at 27. **Gadbois** predates **Douglass** but essentially articulates the same test. The court's default "measure of damages in cases where a homeowner sues for defective construction is the difference between the market value of the house as constructed and the market value that the house would have had if constructed as promised, with the qualification that if it is reasonably practical to cure the defects in construction by repairs, and if the cost of repairs does not exceed the difference in market value, then the measure of damages is the cost of repairs." **Gadbois**, 458 A.2d at 559. Appellants in **Gadbois** sought the difference in market value, but in the instant case Cohen does not argue for difference in market value as a measure of her damages.

*Yanoviak*, 945 A.2d 220, 227 (Pa. Super. 2008); *see also McEwing v. Lititz Mut. Ins. Co.*, 77 A.3d 639, 651 (Pa. Super. 2013) (finding that although expert witness' estimate may have been speculative, it did not prejudice defendant's defense). The trial court's findings are "binding on appeal unless it appears that the court abused its discretion or that the court's findings lack evidentiary support or that the court capriciously disbelieved the evidence." *Christian*, 945 A.2d at 225 (quoting *Hart v. Arnold*, 884 A.2d 316, 331 (Pa. Super. 2005), *appeal denied*, 897 A.2d 458 (Pa. 2006)). In *Viener v. Jacobs*, 834 A.2d 546, 556 (Pa. Super. 2003), *appeal denied*, 857 A.2d 680 (Pa. 2004), *cert. denied*, 543 U.S. 1146 (2005), we noted we will not find an abuse of discretion where there is a "mere difference of opinion regarding an interpretation of facts . . . [, but] rather, an abuse of discretion is found only in flagrant cases where there is **not** a substantial ground for difference of opinion" (emphasis in original).

Under *Douglass*, the appropriate amount of damages here was the "cost of completing the work." 562 A.2d at 916. The trial court found that Steel, Cohen's own witness, determined the cost for completing the subflooring work would amount only to $154, the sum of lines seven to ten in his 2007 estimate. Order, 11/2/16, at 2. The record supports the trial court's conclusion that ServiceMaster would need only to complete lines seven to ten of Steel's estimate to "[ensure] that the subfloor was in proper condition." *Id.* The trial court acted well within its discretion to believe the

relevant parts of Steel's testimony. *See Christian*, 945 A.2d at 227; *Douglass*, 562 A.2d at 916.

Cohen's citation to *Burly* does not support a different result. The contractor in that case contended that it incurred additional costs flowing from a change in a construction contract that required it to use wood-form instead of steel-form materials. 284 A.2d at 843. The company provided an estimate "showing a breakdown of unit cost per square foot between steel-forms and wood-forms" as a means of proving damages. *Id.* at 844. The Commonwealth Court noted that estimations of damages must "have a basis in reason to [to be] legally sufficient." *Id.* Contrary to Cohen's assertion, *Burly* did not involve any issue of lump-sum estimations. Rather, the Commonwealth asserted that Burly's estimate was sufficient because it provided "evidence for reasonable computation." *Id.* at 845.

In sum, we perceive no abuse of discretion by the trial court in calculating damages. Steel provided a line-by-line estimate of the costs needed to repair the subflooring in accordance with the terms of the Agreement stating ServiceMaster would install subflooring, and the trial court accepted that estimate, which totaled $154. Steel conceded that his estimate during trial of $11,556 was for work outside the scope of the Agreement. The trial court acted within its discretion in rejecting the less detailed estimate provided by Eddington. For these reasons, we conclude the trial court did not abuse its discretion by awarding $154 to Cohen.

**Failure to Award Damages for Loss of Use of Cohen's Dwelling**

As her final issue, Cohen argues that the trial court erred in failing to award her damages for loss of use of her dwelling. Cohen's Brief at 29. To recover consequential damages for breach of a construction contract, such damages must be foreseeable by the other party at the time of contracting. ***Frank B. Bozzo, Inc. v. Elec. Weld Div. of Ft. Pitt Bridge Div. of Spang Indus., Inc.***, 423 A.2d 702, 709 (Pa. Super. 1980), ***aff'd***, 435 A.2d 176 (Pa. 1981). Furthermore, a plaintiff must establish a basis for assessing consequential damages. ***Wujcik v. Yorktowne Dental Ass'c. Inc.***, 701 A.2d 581, 584 (Pa. Super. 1997) (affirming trial court's finding that plaintiff's initial evidence, based on his own memories of payments usually received from patients, was inadequate to prove consequential damages); ***see also Bolus v. United Penn Bank***, 525 A.2d 1215, 1226 (Pa. Super. 1987) ("the law requires only that the evidence shall with a fair degree of probability establish a basis for the assessment of damages" (citations and internal quotations omitted)), ***appeal denied***, 541 A.2d 1138 (Pa. 1988). Whether to award consequential damages is a matter committed to the trial court's discretion. ***Cresci Const. Serv., Inc. v. Martin***, 64 A.3d 254, 265 (Pa. Super. 2013) (citing ***TruServ Corp. v. Morgan's Tool & Supply Co.***, 39 A.3d 253, 264 (Pa. 2012)); ***see also Smith v. Penbridge Assocs., Inc.***, 655 A.2d 1015, 1022–23 (Pa. Super. 1995); ***Glomb by Salopek v. Glomb***, 530 A.2d 1362, 1369 (Pa. Super. 1987) ("We assign to the fact finder,

however, the task of assessing the worth and credibility of the testimony on the issue of damages"), ***appeal denied***, 538 A.2d 876 (Pa. 1988).

Cohen contends that she can recover "damages which naturally and proximately flow from the breach of contract," and that her "loss of use of her home is a natural and proximate result of ServiceMaster's poor workmanship." Cohen's Brief at 29 (quoting ***Cresci***, 64 A.3d at 264 n.15). Cohen values the loss of use of her kitchen and bathroom at a minimum of $300 per month. ***Id.***

ServiceMaster counters that any delay in Cohen's inability to use her kitchen and bathroom was the result of her "self-inflicted" decisions to not hire other contractors. ServiceMaster's Brief at 22. ServiceMaster asserts that Cohen failed to mitigate her damages by not seeking other contractors who "could have easily and cheaply" re-shimmed the subfloor for $154 and then "proceeded to rebuild the kitchen." ***Id.***

The trial court did not award Cohen damages for loss of use of her dwelling. In its Rule 1925(b) opinion, the trial court explained: "[s]ince the repairs associated with [Cohen's] work are minimal, there was no justification for this Court to award loss of use damages." Trial Ct. Op. at 4.

We find no abuse of discretion in the trial court's decision. First, Cohen fails to argue that her loss of use of her dwelling was foreseeable. Nothing within the Agreement provided that the kitchen and bathroom would be fully usable after ServiceMaster completed mold remediation and installed the subflooring. In fact, the Agreement stipulated that further work would

need to be completed by a different contractor. Agreement at 1. Secondly, Cohen failed to present any evidence to support her allegation that she incurred $300 per month in damages from loss of use. Finally, even if Cohen had provided a basis to establish consequential damages, the trial court had the discretion to not award them. Accordingly, we find no abuse of discretion and therefore we will not disturb the trial court's decision.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  12/15/2017